# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WILLIAM THOMAS MASSIE<br>DUNNIE RICHARD TUCK<br>DONALD RAYMOND MCCLARREN<br>ROSE BUCHER, Individually and as the duly<br>appointed Personal Representative of the<br>ESTATE OF LLOYD BUCHER,<br>DECEASED, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Court No. 1:06 CV00749(HHK) |
| THE GOVERNMENT OF THE<br>DEMOCRATIC PEOPLE'S REPUBLIC OF<br>KOREA, its Ministries, Agencies and<br>Instrumentalities, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Come now Plaintiffs, William Thomas Massie, Dunnie Richard Tuck, Donald

Raymond McClarren and Rose Bucher, Individually and as the duly appointed Personal

Representative of the Estate of Lloyd Bucher, Deceased, by and through counsel, and

respectfully submit their Proposed Findings of Fact and Conclusions of Law.

Respectfully submitted,

By:    Richard H. Streeter /s/
       Richard H. Streeter
       D.C. Bar No. 946053
       Karen A. McGee
       D.C. Bar No. 426552
       BARNES & THORNBURG LLP
       750 17th Street, NW, Suite 900
       Washington, DC  20006
       Telephone:   (202) 408-6932
       Facsimile:   (202) 289-1330

Dated:  April 9, 2008

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WILLIAM THOMAS MASSIE<br>DUNNIE RICHARD TUCK<br>DONALD RAYMOND MCCLARREN<br>ROSE BUCHER, Individually and as the duly<br>appointed Personal Representative of the<br>ESTATE OF LLOYD BUCHER,<br>DECEASED,<br><br>　　　　Plaintiffs,<br><br>　　vs.<br><br>THE GOVERNMENT OF THE<br>DEMOCRATIC PEOPLE'S REPUBLIC OF<br>KOREA, its Ministries, Agencies and<br>Instrumentalities,<br><br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Court No. 1:06 CV00749(HHK) |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

I.　　**FINDINGS OF FACT**

　　A.　　**INTRODUCTION AND BACKGROUND**

　　　　This action is brought by three U.S. citizens, joined by the widow of a fourth U.S.

citizen, seeking damages for tortious injuries done to them in the course of their

kidnapping, imprisonment and torture while being held hostage by Ministries, Agencies

and Instrumentalities of the Government of the Democratic People's Republic of Korea

("North Korea"), between January 23, 1968 and December 23, 1968, in North Korea.

Jurisdiction is predicated on the terrorism exception to the Foreign Sovereign Immunities

Act ("FSIA"), 28 U.S.C. § 1605(a)(7).

　　　　The action arises from the illegal seizure by North Korea of the U.S.S. Pueblo

("Pueblo") and the taking of the Pueblo's Commander and crew as hostages and their

subsequent eleven-month ordeal.  Plaintiffs include Commander Lloyd Bucher, deceased,

William Massie, Donald McClarren and Dunnie Tuck.  In addition, Rose Bucher brings

this action individually and on behalf of the estate of her deceased husband, Commander

Lloyd Bucher.  The Defendants are the Government of the Democratic People's Republic

of Korea, its Ministries, Agencies and Instrumentalities.

**Hijacking of the U.S.S. Pueblo in International Waters.**

On January 23, 1968, the Pueblo, which was engaged in electronic surveillance

and other activities, sat dead in international waters approximately 25 miles from

Wonson, North Korea and 15.8 miles from the nearest land, North Korea's Ung-do

island.  The Pueblo had no armor protection and was lightly armed with two .50 caliber

machine guns, ten Browning semi-automatic rifles and a handful of .45 caliber handguns.

The Pueblo was manned by a crew of 83, which consisted of U.S. Navy personnel

(including Plaintiffs William Massie, Donald McClarren and Cdr. Lloyd Bucher),

National Security Agency personnel and two civilian oceanographers, which included

Plaintiff Dunnie Tuck.

About noon on January 23, the Pueblo was approached by a North Korean SO-1

class subchaser, hull number 35 ("SC-35").  SC-35 was at general quarters and its deck

guns – a 3-inch cannon and two 57 mm gun mounts—were manned and trained on the

Pueblo.  At 12:12, SC-35 signaled "What nationality."  In response, Cdr. Bucher ordered

the ensign raised and then a flag indicating that the Pueblo was engaged in hydrographic

research.

At 12:20, three North Korean P-4 motor torpedo boats were seen approaching the

Pueblo.  Then, at 12:27, on its third swing around the Pueblo, SC-35 hoisted a new

signal:  "Heave to or I will open fire on you."  The Pueblo, after confirming its location,

signaled that "I am in international waters." By 12:35, the torpedo boats arrived and took up positions around the Pueblo while two snub-nosed MiG-21s began menacingly circling the Pueblo.

Shortly thereafter, new flags were hoisted on one of the torpedo boats: "Follow in my wake. I have pilot aboard." Then a boarding party transferred from the SC-35 to one of the torpedo boats, PT-604, which began backing toward the Pueblo's starboard bow with fenders rigged. Men in helmets with rifles and fixed bayonets stood on PT-604's deck. The signal was repeated: "Heave to or I will open fire."

In response, Cdr. Bucher hoisted the signal: "Thank you for your consideration. I am departing the area." Cdr. Bucher then gave the order to get under way at one-third speed. As the Pueblo began moving, the torpedo boats began crisscrossing the ship's bow and SC-35 again signaled, "Heave to or I will fire." After Cdr. Bucher ordered the speed of the Pueblo increased to full speed, SC-35 gave chase while sailors aboard one of the other torpedo boats, PT-601, uncovered a torpedo tube and trained it on the Pueblo. At this point in time, SC-35 directed all North Korean vessels to clear the area and announced that it was going to open fire on the Pueblo because it would not comply with North Korean navy instructions.

Seconds later, SC-35 commenced firing its 57mm guns and the torpedo boats began firing their 30mm guns. No attempt was made to man the Pueblo's 50mm guns in order to return fire. Although most of the heavy machine gun rounds were aimed over the Pueblo, its signal mast was struck and Cdr. Bucher collapsed with small shrapnel wounds in his ankle and rectum.

Recognizing that there was no escape, Cdr. Bucher, at 1:34, gave the command "All stop" and the signalman was ordered to hoist the international signal for "Protest." The 57mm fire halted but the 30mm fire continued sporadically. After briefly resuming movement, Cdr. Bucher, at about 2:00, once again ordered another "All Stop." Almost immediately, SC-35 closed to a range of about 2,000 yards and fired. Upward of 2,000 rounds pounded into the Pueblo. This round of firing caused the death of Fireman Duane Hodges. At 2:20, the North Koreans once again ordered the Pueblo to come to a stop.

**The Pueblo Is Boarded And Its Crew Taken Hostage.**

At 2:32, a group of two North Korean officers and eight to ten enlisted men armed with AK47 assault rifles boarded the Pueblo. They forcibly gathered the Pueblo crew and forced them to sit blindfolded with their hands and ankles tightly bound. Some of the crewmembers, including Massie, were forced onto the whale deck of the Pueblo where the temperature was significantly below freezing. If a crewmember resisted, the North Koreans spontaneously punched, kicked or jabbed them with their weapons. After some time had passed, the crew members were pulled to their feet and taken inside of the Pueblo where they were forced to sit on the floor in several inches of icy water.

At about 4:00, a second boarding party arrived with a senior North Korean colonel and a civilian pilot, who relieved the Pueblo's helmsman. Following an inspection of the ship by the North Koreans accompanied by Cdr. Bucher, Cdr. Bucher was ordered to sit on the deck outside his cabin.

**Arrival at Wonson, North Korea.**

At about 8:30 p.m. on January 23, 1968, the Pueblo was tied up at a pier about ten miles northwest of Wonson and Cdr. Bucher was interrogated by several high-ranking North Korean officers. When the interrogation was finished, the crew was taken off the

ship and, while bound, forced to walk over a gangplank approximately 8 to 10 inches wide onto North Korean soil.  They were then blindfolded and led in front of an unruly crowd that was yelling insults and spitting at the crew.  The crew was forcibly put into vans with covered windows and was driven to a train station.  When they arrived at the train station, they were pulled from the vans still blindfolded and kicked and beaten with rifle butts and fists in front of another hostile crowd before being loaded unto a train that would transport them to Pyongyang, where they would be held for six weeks.

The train ride to Pyongyang took approximately 10 hours.  During the train ride, the captives, who remained blindfolded and bound, were beaten and interrogated.  Upon arriving in Pyongyang Cdr. Bucher was told that he would leave the train first, with this hands held up.  After getting off the train, Cdr. Bucher and the crew members were photographed as they were led to buses about 150 yards away.  As had been the case with the train, the bus windows were covered so that it was impossible for the captives to see where they were being taken.

**Compound I (the "Barn").**

The bus took the captives to a "prison" building on the outskirts of town, which the crew nicknamed the "Barn," where they were held hostage for the next six weeks. During the six weeks they were detained at the Barn, the hostages, including the Plaintiffs, were continuously tortured and beaten, often to the point of unconsciousness. This harsh treatment consisted of severe physical beatings with karate blows, broom handles, belt buckles, boards and chairs, along with punches with rifle butts and whatever else that was handy.  The beatings were accompanied by intimidation and threats that created the constant fear of execution.  In addition, when the captives were allowed to go

to the toilet to relieve themselves, the guards routinely administered karate kicks on the way from and to the toilet.

**Interrogation of Cdr. Bucher.**

When Cdr. Bucher arrived at the Barn on the morning of January 24, he was led into an unheated room which contained a small table, chair and bed with a thin mattress and one blanket. Immediately afterwards, and at a number of times later that morning, he underwent interrogations at which accusations that he and his crew were spies were repeatedly made. The North Koreans repeatedly told him that he and his crew would be treated as civilian espionage agents, tried under Korean law and shot. In almost every interview, the North Koreans demanded that he sign a typed confession that he was a spy and a member of the Central Intelligence Agency ("CIA") and was trying to start a war. He refused to sign.

About noon, Cdr. Bucher had his first direct interview with the officers who would be in charge of the captives throughout their entire confinement. This officer, nicknamed "Super C" because he was a senior colonel (later renamed "GG" for "Glorious General" after he was promoted), was considered to be highly intelligent, competent, but cruel. At one stage in the interrogations, Cdr. Bucher was confronted with classified publications removed from the ship, including his own narrative log. At about eight p.m. of the first day at the Barn, Cdr. Bucher was again taken to an interrogation room. "Super C", another officer with a drawn pistol, a third officer, two or three enlisted men with bayonets fixed to their guns, and several interpreters were there. Again he was told to sign the typed confession. When he refused, he was told to sign or he would be shot. He was then made to kneel on the floor with the officer whose pistol

was drawn behind him and the third officer in front. While kneeling on the floor, he repeated the phrase "I love you, Rose" over and over to keep his mind off of what was to come. At the end of two minutes, the officer in front of him was ordered to move aside and "Super C" said "Kill the son-of-a-bitch."

Cdr. Bucher heard the gun click, but nothing happened, and he was told that this was a misfire. He was again given two minutes, but when he did not hear a shell eject after the alleged misfire and rearming of the gun, he concluded that they were "playing games" with him. When he again refused to sign at the end of two minutes, he was told that he was "not worth a bullet" and would be beaten to death. The guards then beat him so severely that he lost consciousness. He was taken back to his room and, after regaining consciousness, visited the toilet, where he observed blood in his urine.

At about 10:30 p.m. on January 24, Cdr. Bucher, having not eaten or slept for a day and a half, was returned to the same interrogation room and told that he would now see what happened to spies. He was led to a staff car and driven to a building about ten minutes away. There he was shown a man, allegedly a South Korean, who was strapped to the wall and had undergone intensive physical torture. The victim's head was badly swollen, one eye hung out of its socket and broken bones were evident. Cdr. Bucher was so shocked to see the results of a human being having been so tortured that he was unable to remember leaving the building and being returned to the Barn. The next thing he remembered was being told "Now you know what happens to spies."

About 45 minutes later, Cdr. Bucher was taken again to an interrogation room. During this session he was ultimately informed that the North Koreans would begin shooting his crew, in his presence, one by one, beginning with the youngest, and that

- 7 -

after all had been killed, they could, and would, be able to make him sign the confession before killing him. He was told that his interrogators had already sent for Engineman Fireman Howard E. Bland. When Bland was brought into the room, Cdr. Bucher was convinced that the North Koreans would carry out the threat and that he was not prepared for this type of mental torture. He therefore signed the confession.

### **Interrogation of the Crew Members.**

When the buses arrived at the Barn in the early morning hours of January 24th, the Pueblo crew was separated into rooms as they filed into the building. The heating system was off, bare light bulbs provided constant illumination, the widows were covered, and the hallways were dim. The atmosphere was one of cold, pierced by yelling, stomping, pounding and screaming.

Rats and various vermin overran the facility. As a result of bed bug bites, Plaintiff Massie developed a severe infection that caused his leg to become inflamed and swollen. After the leg had swollen to twice its normal size, a North Korean doctor, without the use of an anesthetic, sliced it open with a pocket knife in order to drain the infection and swab the opened area of the leg with some type of medicine. Because Massie was unable to control the movement of his leg, one of his captors sat on his stomach while two others held his legs down on the table on which he had been placed.

In the rooms, a cup of water sat on a small table which had four chairs at which the crewmembers were forced to sit during the entire day. The men were told not to speak to one another, to keep their heads down, and to stand at attention when a North Korean entered the room. The rooms also had four five foot beds with a husk mattress and pillow, but no blankets.

Immediately upon arrival at the Barn, the North Koreans began their unrelenting assault on the crew to get them to admit to crimes. Men were taken, in what seemed to be a random order, and interrogated about their jobs on the Pueblo, and why the Pueblo had intruded into its territorial waters and spied on North Korea. Each man was told that he must admit his crimes if he hoped to live and someday see his family again. Fists, gun butts and kicks were accompanied with screams of "you will be shot as spies." The physical and mental brutality continued 24 hours a day as men were taken to and from interrogation rooms and beaten until they were unconscious. Back in their cells, each man was given a pencil and paper and told to write out a personal life history. Again, the men were told they would be shot as spies if they did not comply.

**Compound II (The Farm – 42 Weeks of Beatings, Brain Washing and Propaganda).**

On March 4, 1968, after forced confessions were obtained as a result of the repeated intimidation beatings, interrogation beatings and beatings to extract general confessions of guilt for operating a "spy" ship, the hostages were moved to a site outside the city that they designated the Farm. This facility was located on the outskirts of Pyongyang. Upon arriving at the second compound, they were advised that this would be their home until they became sincere and the United States apologized. They were grouped in rooms of eight men, except for one room of four. Officers were placed in their own rooms. This period of detention lasted 42 weeks until December 23, 1968.

Although the living conditions were better, the hostages were provided inadequate rations and forced to live in unsanitary conditions. Personal hygiene was largely ignored. About every 6 weeks, each room was marched to the bathroom and given one basin of hot water with which to bathe. Each man's clothes consisted of the uniform he wore. No means were provided to wash the clothing.

A cyclic pattern of calm and harassment was established as a form of mental and psychological terror.  Throughout the time until late November, indiscriminate beatings continued.  The officers and selected individuals were singled out for periodic torture to exert control over the captives and to coerce additional confessions for release to the world.

The North Koreans used extreme mental pressures to enforce the rules, such as the "no talking" rule.  While marching back to his room, Plaintiff Massie asked the Pueblo's Operations Officer whether he had heard any news.  This was overheard by the guards.  After Massie entered his room, he was confronted by a particularly large guard known as the Bear, who began screaming at Massie while pointing his AK-47 at Massie's head.  He then indicated that Massie was to open his mouth.  At that point, the Bear stuck his AK-47 into Massie's mouth and pulled out the clip to show that it was loaded.  He reinserted the clip and then put his finger into the trigger guard while he continued to scream at Massie.  Finally, he pulled the gun out of Massie's mouth and proceeded to club Massie with the butt of the gun until Massie was knocked over.

During this period, North Korea was engaged in a prolonged effort to extract a public apology from the United States Government for the Pueblo intruding into North Korea's territorial waters and for spying on North Korea.  As part of this effort, the hostages were also forced to participate in staged press conferences held August 13 and September 12.  The latter press conference was an international (communist) press conference.  At both sessions, the Pueblo's crew inserted innuendos and archaic and corny language into the prepared statements to thwart the propaganda.

In addition, the North Koreans pressured the hostages to write false and humiliating letters home to family, friends and members of Congress reporting the humane treatment they were receiving and asking that the United States apologize for the spying and intrusions into North Korean waters.

**HELL WEEK.**

During the period that they were held hostage, the Pueblo's crew was subjected to North Korean propaganda films. In June 1968, two short subjects were shown in which it became apparent that the North Koreans did not know what the middle finger gesture meant. This knowledge became an integral part of the crew's anti-propaganda campaign. When asked what the finger meant, the crew deceived the North Koreans by explaining that it was the "Hawaiian Good Luck Sign." This would later result in two weeks of severe beatings and torture of every hostage in early December.

The October 18 issue of *Time Magazine* exposed the true meaning of the "Hawaiian Good Luck Sign." In late November or early December, the North Koreans learned that the middle finger gesture which had been shown in many pictures and videos was an obscene gesture. When they learned that they had been discredited by the displaying of an obscene gesture in their propaganda photographs, the North Koreans were enraged. This started HELL WEEK which actually lasted about two weeks. The hostages were savagely beaten by the North Koreans for several hours at a time during the duration of HELL WEEK and were subjected to other harsh methods to get them to "confess" as to the identity of the instigators behind the deception of their captors. For example, some hostages, including Plaintiff Massey, were forced to kneel on the floor while two guards placed a 2-inch diameter pole behind their knees and other guards jumped on each end of it several times. In addition, the Bear would smash a hammer

handle into the heads of the captives, completely encircling their heads with lumps as they screamed in pain.

Plaintiff McClarren had a board placed between his knees and then forced to lie backwards until his back touched his legs. After remaining in this position for several hours, one of the North Koreans came into the room and ordered him to get up and sit in a chair. McClarren was unable to walk and had to crawl to the chair. When he was seated, the guard pulled his pistol, pointed it at McClarren's head and pulled the trigger. After hearing the click of the hammer, McClarren passed out.

During HELL WEEK, the guards repeatedly jumped on the back of Plaintiff Tuck after he was forced to the floor. He was also forced to hold up a chair while the guards beat him in the stomach and back.

**Release of the Hostages**

The beatings came to an abrupt halt in mid-December. On December 19, Glorious General met with the hostages and restored their basic privileges. The hostages were given one more opportunity to repent, be sincere and write a new confession. Wounds were treated and the hostages were given hard boiled eggs to roll on their bloodshot eyes to break up the clots caused by the beatings. On December 22, Glorious General advised the hostages that the United States was apologizing. Shortly thereafter, a new set of clothes was distributed to the hostages. This was followed by a night train ride to the border and final repatriation at noon on December 23, 1968 at Panmunjom.

**B.  DAMAGES SUFFERED BY THE INDIVIDUAL PLAINTIFFS.**

1.  William Thomas Massie (hereinafter "Massie") is a United States citizen and a domiciliary of the State of Illinois. At the time he was taken hostage on January 23, 1968, Massie was a Machinist Mate 3rd Class. During the course of the

Pueblo being hijacked and the eleven months of being held hostage until his release on

December 23, 1968, Massie was beaten and tortured and subjected to constant mental and

psychological terror on a daily basis.  Massie sustained severe and permanent physical

injuries, has been suffering from Post Traumatic Stress Disorder, disability and

disfigurement, lost wages and earning potential and has incurred medical expenses on

account of his injuries.  Massie continues to suffer great pain and agony of mind and

body.  During the eleven months of captivity, Massie was deprived of his basic human

rights because he was deprived his freedom and was prevented from partaking in his

normal activities.

   2.  Dunnie Richard Tuck (hereinafter "Tuck") is a United States

citizen and is currently a domiciliary of the State of Mississippi.  Immediately prior to

being assigned to the Pueblo, Tuck was domiciled in the Commonwealth of Virginia.  At

the time he was taken hostage on January 23, 1968, Tuck was one of two civilian

oceanographers aboard the Pueblo.  During the course of the Pueblo being hijacked and

the period of eleven months of being held hostage until his release on December 23,

1968, Tuck was beaten and tortured and subjected to constant mental and psychological

terror on a daily basis.  Because he was in civilian clothes at the time he was hijacked, he

was considered the "SPY".  Because civilians do not fall under the Geneva Convention

rules, Tuck was aware that he could be shot immediately, with no international recourse.

This loomed over his head throughout his incarceration and caused him severe emotional

distress.  Tuck sustained severe and permanent physical injuries, has been suffering from

Post Traumatic Stress Disorder, disability and disfigurement, lost wages and earning

potential and has incurred medical expenses on account of his injuries.  Tuck continues to

suffer great pain and agony of mind and body.  During the eleven months of captivity,
Tuck was deprived of his basic human rights because he was deprived his freedom and
was prevented from partaking in his normal activities.

   3. Donald Raymond McClarren (hereinafter "McClarren")
McClarren is a United States citizen and a domiciliary of the Commonwealth of
Pennsylvania.  At the time he was taken hostage on January 23, 1968, McClarren was a
Petty Officer 2nd Class, or CT02, Communications Tech, Operator (teletype and crypto).
During the course of the Pueblo being hijacked and the period of eleven months of being
held hostage until his release on December 23, 1968, McClarren was beaten and tortured
and subjected to constant mental and psychological terror on a daily basis.  McClarren
sustained severe and permanent physical injuries, has been suffering from Post Traumatic
Stress Disorder, disability and disfigurement, lost wages and earning potential and has
incurred medical expenses on account of his injuries.  McClarren continues to suffer great
pain and agony of mind and body.  During the eleven months of captivity, McClarren
was deprived of his basic human rights because he was deprived his freedom and was
prevented from partaking in his normal activities.

   4. Cdr. Bucher was, prior to his death on January 28, 2004,  a United
States citizen and a domiciliary of the State of California.  At the time he was taken
hostage on January 23, 1968, Cdr. Bucher was the Commander of the USS Pueblo.
During the course of the Pueblo being hijacked and the period of eleven months of being
held hostage until his release on December 23, 1968, Cdr. Bucher was beaten and
tortured and subjected to constant mental and psychological terror on a daily basis.  Cdr.
Bucher sustained severe and permanent physical injuries, suffered from Post Traumatic

Stress Disorder, disability and disfigurement, lost wages and earning potential and incurred medical expenses on account of his injuries. Until his death, Cdr. Bucher suffered great pain and agony of mind and body. During the eleven months of captivity, Cdr. Bucher was deprived of his basic human rights because he was deprived his freedom and was prevented from partaking in his normal activities.

     5.    Rose Bucher is the widow of Cdr. Bucher and is the duly appointed Personal Representative of the ESTATE OF LLOYD BUCHER, DECEASED. Rose Bucher has at all relevant times been a United States citizen and a domiciliary of the State of California. The unlawful conduct of North Korea, which included the kidnapping, torture, beating and prolonged detention and holding hostage of Rose Bucher's husband, Cdr. Bucher, caused Rose Bucher to lose and be deprived of the services, support, affection, consortium and companionship of her husband.

     6.    Plaintiffs Massie, Tuck, McClarren and Cdr. Bucher were the victims of the terrorist activities of North Korea and its agents. Such unlawful, terrorist activities included torture, assault, battery, kidnapping, false imprisonment and intentional infliction of emotional distress and loss of solatium.

## CONCLUSIONS OF LAW

     1.    As this action is brought against a foreign state, the Foreign Sovereign Immunities Act of 1976, 28 U.S.C.A. §§ 1602-1611 et seq., as amended, controls. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 103 S. Ct. 1962 (1983); 28 U.S.C. § 1330. The sole bases for subject matter jurisdiction in an action against a foreign state defendant are the enumerated exceptions to the Foreign Sovereign

- 15 -

Immunities Act.  *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 109

S. Ct. 683 (1989).

2.       In the Anti-Terrorism and Effective Death Penalty Act of 1996, Pub.L.

No. 104-132, § 221(c), 110 Stat. 1214, 1243, Congress lifted the immunity of foreign

states officially designated by the Department of State as a state sponsor of terrorism, if

the foreign state commits a terrorist act or provides material support and resources to an

individual or entity that commits such an act resulting in the death or personal injury of a

United States citizen.  *See* 28 U.S.C.A. § 1605(a)(7), which provides that a foreign

sovereign will not be immune to suit in U.S. courts when:

> money damages are sought against a foreign state for
> personal injury or death that was caused by an act of
> torture, extrajudicial killing, aircraft sabotage, hostage
> taking, or the provision of material support or resources (as
> defined in section 2339A of title 18) for such an act if such
> act or provision of material support is engaged in by an
> official, employee, or agent of such foreign state while
> acting within the scope of his or her office, employment, or
> agency.

*See* also H.R. Rep. No. 383, 104th Cong., 1st Session 1995 at 137-38, available at 1995

WL 731698.

3.       Although Plaintiffs Massie, Tuck, McClarren and Cdr. Bucher were

released from captivity more than twenty-five years prior to the enactment of the Anti-

Terrorism and Effective Death Penalty Act of 1996, Congress has expressly directed the

retroactive application of 28 U.S.C.A. § 1605(a)(7) in order to further a comprehensive

counter terrorism initiative by the legislative branch of government.  *See* 28 U.S.C.A. §

1605 note (West Supp. 1997) ("amendments made by this subtitle shall apply to any

cause of action arising before, on or after the date of the enactment of this act [April 24,

1996])."  Similarly, to the same effect, the ten-year statute of limitations for actions under

§ 1605(a)(7) does not bar the claims in this case because, once again, Congress has

provided that victims of terrorism be given benefit of "all principles of equitable tolling,

including the period during which the foreign state was immune from suit …" 28 U.S.C.

§ 1605(f).  Because North Korea was immune from suit by these Plaintiffs under the

FSIA until the enactment of § 1605(a)(7) in 1996, the Complaint herein was duly and

timely filed on April 24, 2006.  A copy of the Complaint, which was translated into

Korean, was properly served with process pursuant to 28 U.S.C. § 1608(b)(3)(B), on

September 8, 2006.  Defendants have failed to respond or appear in the case.

      4.      To establish subject matter jurisdiction and subject a foreign sovereign to

suit under section 1605(a)(7), a claim must contain the following statutory elements:

that personal injury or death resulted from an act or torture, extrajudicial killing, aircraft sabotage or hostage taking; and

the act was either perpetrated by the foreign state directly or by a non-state actor which receives material support or resources from the foreign state defendants; and

the act or the provision of material support or resources is engaged in by an agent, official or employee of the foreign state while acting within the scope of his or her office, agency or employment; and

that the foreign state be designated as a state sponsor of terrorism either at the time the incident complained of occurred or was later so designated as a result of such act; and

if the incident complained of occurred with the foreign state defendant's territory, plaintiff has offered the defendants a reasonable opportunity to arbitrate the matter; and

either the plaintiff or the victim was a United States national at the time of the incident; and

similar conduct by United States agents, officials, or employees within the United States would be actionable.

      5.      Sections 1605(e)(1) and (2) of the FSIA provides guidance with regard to

interpreting the terms "torture" and "hostage taking."

      6.      Article One of the International Convention Against the Taking of

Hostages defines the term "hostage taking" as:

[a]ny person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an intentional intergovernmental organization, a natural or juridical persona, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offense of taking of hostages within the meaning of this Convention.

7.     "Torture" is defined in § 3 of the Torture Victim Protection Act of 1991, as the following:

(a) the term 'torture' means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

(b) mental pain or suffering refers to prolonged mental harm caused by or resulting from-

the intentional infliction or threatened infliction of severe physical pain or suffering;

the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

the threat of imminent death; or

the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality."

8.     Plaintiffs Massie, Tuck, McClarren and Cdr. Bucher have satisfied each of the requirements set forth above.  North Korea has been designated a state sponsor of terrorism, in part due to its unlawful seizure of the Pueblo.  *See* Public Notice 1048, U.S.

Department of State, dated February 5, 1998, 53 FR 347701, 1988 WL 276528 (F.R.)

("In accordance with Section 6(j) of the Export Administration Act (50 U.S.C. App.

2405(j)), I hereby determine that North Korea is a country which has repeatedly provided

support of acts of international terrorism."  George P. Shultz, Secretary of State).  *See*

*also,* 134 Cong. Rec. H475-02, H. Con. Res. 246, *Condemning the Bombing by North*

*Korean Agents of Korean Air Lines Flight 858* (Feb. 24, 1988) (expressing "the

bipartisan support in the Congress for the sanctions imposed by the executive branch,

including the addition of North Korea to the list of states supporting international

terrorism which is maintained pursuant to section 6(j) of the Export Administration Act

of 1979").

      9.    The severe, coercive mistreatment to which they were subjected during

their incarceration proves that Plaintiffs Massie, Tuck, McClarren and Cdr. Bucher were

victims of "torture" as defined in section 3 of the Torture Victims Protection Act of 1991

(28 U.S.C. § 1350 note), pursuant to 28 U.S.C. §§ 1605(a)(7) and 1605(e)(1).  Similar

conduct by United States agents, officials, or employees within the United States would

be actionable.

      10.    Because they were held by North Korea in an attempt to exact an apology

from the United States for the alleged intrusion into North Korean territorial waters and

to force them to confess to involvement with CIA activities and other false charges,

Plaintiffs Massie, Tuck, McClarren and Cdr. Bucher were victims of "hostage taking" as

defined in Article 1 of the International Convention Against the Taking of Hostages,

pursuant to 28 U.S.C. §§ 1605(a)(7) and 1605(e)(1).

11.     Plaintiffs Massie, Tuck, McClarren and Cdr. Bucher have suffered "personal injury" within the definition of 28 U.S.C. §§ 1605(a)(7) as the result of Defendants' actions and activities while holding them hostage in North Korea.

12.     Even though North Korea has failed to respond to the Complaint served on September 8, 2006 under section 1608 of the FSIA, North Korea, by letter dated March 27, 2008, has been provided an opportunity to arbitrate the claims at issue here.

13.     All of the plaintiffs herein were American citizens at the time that Massie, Tuck, McClarren and Cdr. Bucher were taken hostage and tortured. They remain American citizens as of the date of trial.

14.     Once a foreign state's immunity has been lifted under section 1605 and jurisdiction is proper, section 1606 provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. As explained in *Price v. Socialist People's Libyan Arab Jamahiriya,* 384 F.Supp.2d 120, 132 (D.D.C. 2005)(some internal citations omitted):

> Section 1606 acts as a "pass through" to substantive causes of actions against private individuals that may exist in federal, state, or international law….Our Court of Appeals has never had the opportunity to explicitly sanction any particular cause of action as a basis of liability for a state that has lost immunity under 1605(a)(7). … However, the Supreme Court makes clear that state law can provide the basis for liability. When a state is not immune from suit, and "state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances. *First Nat. City Bank v. Banco Para El Comercio Exterior De Cuba,* 462 U.S. 611, 622 n.11, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983); *see also Brink's Ltd. V. South African Airways,* 93 F.3d 1022, 1030-32 (2d Cir. 1996) (noting that "state law generally controls in FSIA cases"). Recent opinions of this district court hold foreign states liable for terrorist activity on state law grounds.

15.    State law provides a basis for liability in this case.  The federal choice of law rule follows that of the *RESTATEMENT (SECOND) OF CONFLICTS*, which provides that the law of torts is to apply.  When another jurisdiction however has a stronger interest and closer connections to the case, it is appropriate to apply that jurisdiction as Law. *RESTATEMENT (SECOND) OF CONFLICTS* § 175 (1969).  Although the actions complained of in the instant case took place in North Korea, the United States and the various States in which Plaintiffs are and were domiciled at the time of the incident (namely California, Illinois, Virginia and Pennsylvania) have a much stronger interest than North Korea in adjudicating this action arising from the hostage taking and torture of United States citizens by North Korea.

**(Torture)**

16.    The torturing of Plaintiffs Massie, Tuck, McClarren and Cdr. Bucher by officials of North Korea -- directed at coercing them to confess to invading North Korean territorial waters and being involved with an alleged CIA plot to start a war with North Korea in order to exact an apology from the United States -- is the kind of harm that the United States has a state interest in discouraging.  Given the strong United States interest, in addition to the strong interest of plaintiffs' home states in providing legal relief to their residents, the laws of Illinois, Virginia, Pennsylvania and California should govern the tort claims of Plaintiffs Massie, Tuck, McClarren and Cdr. Bucher.

17.    Plaintiffs each allege common law assault, battery, false imprisonment, intentional infliction of emotional distress and loss of solatium.  They also seek money damages for economic damages, solatium, pain and suffering for the acts that are among

those described in 28 U.S.C. § 1605(a)(7).  The acts complained of include personal injury that was caused by acts of torture and hostage taking.

18.    Torture is a severe form of battery which, under California law, "is any intentional, unlawful and harmful contact by one person with the person of another." *Ashcraft v. King,* 228 Cal. App. 3d 604, 611 (Cal. Ct. App. 1991). Specifically, the tort of civil battery consists of the following three elements:

(1) the defendant intentionally did an act that resulted in a harmful or offensive    contact with the plaintiff;

(2) the plaintiff did not consent to the contact;

(3) the contact caused injury, damage, loss or harm to the plaintiff.  *Id.*

All of these elements have been demonstrated and proven in this case.

19.    In *Priest v. Rotary,* 634 F.Supp. 571, 584 (N.D. Cal. 1986), the district court held that "[u]nder California law, when a person is injured by the tortuous acts of another, she is entitled to recover from the tortfeasor an amount that will compensate for all the detriment proximately caused by the tortuous acts."

20.    It is also well established in California that the damages recoverable by the victim of a tortuous act may also include recovery for "the grief, anxiety, worry, mortification, and humiliation which one suffers by reason of physical injuries." *Merrill v. Los Angles Gas & Elec. Co.,* 158 Cal. 499, 512 (Cal. 1910).

21.    An essentially identical cause of action for battery is available under the laws of the Commonwealths of Pennsylvania and Virginia and the State of Illinois. Under federal common law, and supported by state and international law and the common law of torts, Plaintiffs can recover for torture as stated in the complaint.

- 22 -

**(Assault And Battery)**

22.    The named Defendants in this action are responsible for numerous acts of assault and battery upon Plaintiffs during their arrest, imprisonment, and torture.  Under California law and under the laws of the State of Illinois and the Commonwealths of Pennsylvania and Virginia, a civil action for assault is based upon actions or inactions by a defendant that place the person in fear of personal harm. *Kiseskey v. Carpenters' Trust for Southern California,* 144 Cal.App.3d 222, 232 (Cal. Ct. App. 1983) ("[t]he tort of assault is complete when the anticipation of harm occurs" and the tort of civil battery consists of the following three elements, (i) the defendant intentionally did an act that resulted in a harmful or offensive contact with the plaintiff; (ii) the plaintiff did not consent to the contact; (iii) the contact caused injury, damage, loss or harm to the plaintiff) (citing *Ashcraft v. King, supra,* 228 Cal. App.3d at 611).  *See also, Cohen v. Lit Brothers*, 166 Pa. Super. 206, 209 (Pa. Super. Ct. 1950) (Assault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person); *Koffman v. Garnett,* 265 Va. 12, 16 (Va. 2003) (the tort of "battery" is an unwanted touching which is neither consented to, excused, nor justified, whereas the tort of assault consists of an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery); *Cohen v. St. Joseph Memorial Hospital, Inc.*, 648 N.E.2d 329, 332 (Ill. App. 5 Dist. 1995) (an actor commits a battery if he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and a harmful contact with

the person of the other directly or indirectly results) (quoting RESTATEMENT (SECOND) OF TORTS, § 13 (1965)); *Parrish by Bowker v. Donahue*, 443 N.E.2d 786, 788 (Ill. App. 3 Dist. 1982) (battery is the "willful touching of the person of another or a successful attempt to commit violence on the person of another," whereas assault is the "intentional, unlawful offer of corporal injury by force, or force unlawfully directed, under such circumstances as to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented"). In addition, federal common law takes an essentially identical position. *See* RESTATEMENT (SECOND) OF TORTS §§ 13, 21, and 27.

23.    Plaintiffs are entitled to recover for the multiple assaults and batteries that were committed by Defendants during the course of eleven months between January 23, 1968 and December 23, 1968.

**(False Imprisonment)**

24.    The named Defendants in this action are responsible for the false imprisonment of Plaintiffs. At the time that the USS Pueblo and the Plaintiffs came under an unprovoked and unlawful attack by military elements of North Korea, they were operating in international waters beyond the boundaries of North Korea. After being forcibly removed from their ship, Plaintiffs were unlawfully detained and held hostage against their will and without their consent for a period of eleven months.

25.    California, Pennsylvania, Illinois and Virginia provide a cause of action for false imprisonment as alleged in the instant complaint. *Lincoln v. Grazer,* 329 P.2d 928, 930 (Cal. Ct. App. 1958) (a false imprisonment action can still be maintained if "the defendant unlawfully detains the [plaintiff] for an unreasonable period of time" after an

- 24 -

otherwise legal seizure or arrest.) *See also, Molko v. Holy Spirit Ass'n,* 762 P.2d 46, 63 (Cal. 1988) (false imprisonment is defined as the "nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short"); *Fagan v. Pittsburgh Terminal Coal Corporation,* 299 Pa. 109 (Pa. 1930) (elements of false imprisonment in Pennsylvania are the detention of another person and the unlawfulness of such detention); *Ross v. Mauro Chevrolet*, 861 N.E.2d 313, 317 (Ill. App. 1 Dist. 2006) (must show that plaintiff was restrained or arrested by the defendants and that the defendants acted without having reasonable grounds to believe that an offense was committed by the plaintiff) (quoting *Reynolds v. Menard, Inc.*, 850 N.E.2d 831 (Ill. App. 1 Dist. 2006); *Russell v. Kinney Contractors, Inc.*, 795 N.E.2d 340, 347 (Ill. App. 5 Dist. 2003) (False imprisonment requires unreasonable or unlawful restraint of personal liberties against one's will, caused or procured by the defendant, and that the defendant actually or legally intended the restraint) (citing *Arthur v. Lutheran General Hospital, Inc*., 692 N.E.2d 1238-1243 (Ill. App. 1 Dist. 1998); *Zayre of Virginia, Inc. v. Gowdy*, 147 S.E.2d 710, 713 (Va. 1966) (False imprisonment is restraint of one's liberty, or the reasonable apprehension of forced restraint of one's liberty, without any sufficient cause, but does not require a showing of confinement in jail or placement in the custody of an officer, or that the defendant acted with malice, ill will or with the slightest wrongful intention) (citing *Montgomery Ward & Co., v. Wickline*, 50 S.E.2d 387 (Va. 1948)).  Federal common law and a number of federal statutes (including the Federal Tort Claims Act) also provide a cause of action for false imprisonment, and § 1606 of the FSIA attaches liability to a foreign state "in the same manner and to the same extent as a private individual under like circumstances."

26.    The facts conclusively demonstrate that Plaintiffs were falsely imprisoned by Defendants, and pursuant to the FSIA, federal common law and state law, this cause of action can proceed against all Defendants.

**(Intentional Infliction of Emotional Distress)**

27.    California law provides a claim for intentional infliction of emotional distress where a plaintiff can satisfy the following elements: "(1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering and (4) actual and proximate causation of the emotional distress."  *See Agarwal v. Johnson,* 25 Cal.3d 932, 946 (Cal.1979), overruled on other grounds in *White v. Ultrimar,* 21 Cal.4th 563, 574 n.4 (Cal.1999). Similar relief is recognized by Illinois and Virginia. *Reilly v. Wyeth*, 876 N.E.2d 740, 755 (Ill. App. 1 Dist., 2007) (must be pled with specificity and allege that the conduct 1)was truly extreme and outrageous, 2) that the actor either intended that his conduct inflict severe emotional distress, or knew that there was a high probability that the conduct would cause severe emotional distress, and 3) that the conduct, in fact, caused severe emotional distress) (quoting *Welsh v. Commonwealth Edison Co.*, 713 N.E. 2d 679, 684 (Ill. App. 1 Dist., 1999)); *Ogunde v. Prison Health Service, Inc.*, 645 S.E.2d 520, 526 (Va. 2007) (a plaintiff must allege that the wrongdoer's conduct was intentional or reckless, the conduct was outrageous or intolerable, there was a causal connection between the wrongdoer's conduct and the resulting emotional distress, and that the resulting emotional distress was severe) (quoting *Sanchez v. Medicorp Health Systems*, 618 S.E.2d 331, 333 (Va. 2005)).

28.    While Pennsylvania has not expressly recognized a cause of action for intentional infliction of emotional distress, the courts have cited the RESTATEMENT (2D) OF TORTS §46(2) as setting for the minimum elements necessary to sustain such a cause of action. *Taylor v. Albert Einstein Medical Center*, 754 A.2d 650, 652 (Pa. 2000), citing, *Kazatsky v. King David Memorial Park,* 515 Pa. 183, 527 A.2d 988 (Pa. 1987).

29.    In *Cervantez v. J.C. Penny Co.,* 24 Cal. 3d 579, 593 (Cal. 1979), the court cited to the Restatement (Second) of Torts §6, Comment d., and held that in order for defendant's conduct to be considered "outrageous," it "must be so extreme as to exceed all bounds of that usually tolerated in a civilized community."

30.    Under California law, damages for intentional infliction of emotional distress may be recovered for both economic losses, which include "[r]easonable compensation for any financial loss suffered by the plaintiff which was proximately caused by emotional distress," and non-economic losses such as damages for "humiliation, anxiety, and mental anguish." *Agarwal v. Johnson, supra,* 25 Cal.3d at 953.

31.    At all times herein relevant Rose Bucher was the lawful spouse of Cdr. Bucher.  Cdr. Bucher died on January 28, 2004.  During his lifetime, Cdr. Bucher had a cause of action for the physical injuries and damages he suffered at the hands and feet of North Korean, as well as mental injuries inflicted through other outrageous conduct such as the threats to kill the crew and forcing him to view the body of a human being who had been brutally and savagely tortured in order to exact a confession from him.  Such causes of action survive pursuant to state law and are brought by the Plaintiff, Rose Bucher, the Personal Representative of the Estate of Lloyd Bucher, Deceased.  Moreover, the

outrageous tortuous conduct of North Korea proximately caused all other Plaintiffs to experience severe emotional distress, literally, terror.

**(Loss Of Solatium)**

32.      Cdr.Bucher was a member of the crew of the USS Pueblo at the time of its unlawful capture by North Korea.  At all times herein relevant Rose Bucher was the lawful spouse of Cdr. Bucher.  The tortuous conduct of North Korea proximately caused Rose Bucher to lose and be deprived of the services, support, consortium, affection, companionship, solatium of and with her husband, Lloyd Bucher.

33.      This Court has recognized the cause of action for loss of solatium under the federal common law by relying upon the SECOND RESTATEMENT OF TORTS § 46 (1986) ("one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress. … All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience." *Stethem v. Islamic Republic of Iran,* 201 F. Supp. 2d 78, 89 (D.D.C 2002).

**Damages**

34.      The terrorist acts of the Defendants were intentional, malicious, and performed deliberately to physically and mentally injure, damage, and harm the crew members of the USS Pueblo and Rose Bucher such that the Defendants should be subjected to punitive damages to punish said Defendants and to deter them and others from committing such acts in the future.

35.      As a result of North Korea's outrageous conduct, Plaintiffs were subjected to both mental and physical torture by North Korea throughout their incarceration, the

effects of which have been felt by Plaintiffs for the last forty years and will be felt by

Plaintiffs for the rest of their lives.  Because section 1606 of the FSIA provides that a

"foreign state shall be liable in the same manner and to the same extent as a private

individual under like circumstances," 28 U.S.C. § 1606, plaintiffs are entitled to the

typical array of compensatory damages that may be awarded against tortfeasors in

California, Virginia, Illinois and Pennsylvania, including, for example, pain and suffering

and lost past and future wages.

### (Pain and Suffering During Captivity)

36.     The evidence of Plaintiffs' pain and suffering, both physical and mental,

over the eleven months of captivity is extensive and shocking.  Although the Courts have

found that putting a number on these kinds of harms can be difficult, precedence guides

the calculations.  In many cases of prolonged and abusive captivity, such as the case

herein, Plaintiffs are awarded approximately $10,000 per day for the pain and suffering

they experienced while captive.  *Price v. Socialist People's Libyan Arab JamahiriYa,*

*supra,* 384 F.Supp.2d at 134.

37.     Plaintiffs ask the Court to follow the per diem approach of this Court in

*Price v. Socialist People's Libyan Arab JamahiriYa, supra,* 384 F.Supp.2d at 135;

*Sutherland v. Islamic Republic of Iran,* 151 F.Supp.2d 27, 51 (D.D.C. 2001).  In those

cases, the Court awarded $10,000 per day for the pain and suffering they experienced

while captive.  Given the similarity in treatment and the horrors that were endured by

Plaintiffs Massie, Tuck, McClarren and Cdr. Bucher, the Court concludes that each

Plaintiff in this case is entitled to $3,350,000 for the pain and suffering they endured

throughout their 335 days of captivity.

**(Pain and Suffering After Captivity)**

38.    As was also recognized in *Price,* "[i]n some cases the per diem amount will adequately compensate plaintiffs for pain and suffering both during and after captivity."  As was the case in *Price,* "this is not one of those cases."  In this case, plaintiffs suffered physical and mental harm that has endured for the past 40 years and will likely continue to endure throughout the rest of their lives.  Not only do plaintiffs continue to suffer physical disabilities, including post traumatic stress disorder, but they have had continued difficulty in daily living, in social interactions, and in employment.

39.    A $3,350,000 pain and suffering award is lower than numerous other such awards in like cases and does not fully compensate plaintiffs.  In *Acree v. Republic of Iraq,* 271 F.Supp.2d 179 (D.D.C. 2003), the court was faced with awarding damages to American soldiers who had been captured and tortured during the Gulf War of 1991.  The *Acree* court awarded plaintiffs a lump sum for pain and suffering felt after captivity. *Acree,* 271 F.Supp.2d at 220-21.  That court's discussion is apt:

> Each [plaintiff] has had to learn to deal with a life shattering experience.  Some have undergone recurrent painful medical procedures to seek to undo the physical injury done by the Iraqi torturers.  Some have seen their marriages and family lives disrupted.  Others have suffered in their professional lives.  All have been profoundly affected and may continue to suffer for the rest of their lives.  Michael Ambrose, the Director of the Repatriated Prisoner of War Program at the Naval Operational Medicine Institute (NOMI), noted that "many of the POWs continue to suffer from lingering effects of the injuries and medical problems incurred during captivity … and many of these will persist throughout the lifetime of the patients affected".

*Id.* at 220.

40.    The *Acree* court also recognized the particularly severe emotional harm

that certain of the POWs suffered as a result of their captivity.  *Id.*  One such POW,

Clifford Acree, was described as suffering the following:  In 1992, he was

> diagnosed with Post-Traumatic Stress Disorder ("PTSD")
> arising from his mistreatment in Iraq.  In 1998, while on
> assignment to NATO, he suffered what was diagnosed as a
> Major Depressive Episode coincident with a recurrence of
> PTSD.  He returned to the United States, where he was
> placed on medical leave during seven months of psychiatric
> treatment.  He still suffers a number of problems caused by
> his captivity, including rapid and irregular heartbeat, low
> back pain, night sweats, headaches, nervousness when
> stressed, irritability when tired, numbness and tingling in
> his upper extremities, and some hearing loss and tinnitus.

*Id.* at 187.

41.    The effects suffered by Acree and many of his fellow POWs are virtually

identical to the effects that Plaintiffs Massie, Tuck, McClarren and Cdr. Bucher endured

and will likely endure.  On this basis, the Court will award each Plaintiff the same

$7,000,000 amount of damages for pain and suffering felt after captivity that the Acree

court awarded to severely injured POWs such as Clifford Acree.  This award brings each

Plaintiff's total pain and suffering award to $10,350,000, a figure that, to the Court,

sufficiently reflects Plaintiffs' total pain and suffering.

The Court also awards reasonable attorneys' fees and costs of suit, according to

offered proof.

Signed:


Henry H. Kennedy, Jr.
United States District Judge
Dated:_____