## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WILLIAM THOMAS MASSIE<br>DUNNIE RICHARD TUCK<br>DONALD RAYMOND MCCLARREN<br>ROSE BUCHER, Individually and as the duly<br>appointed Personal Representative of the<br>ESTATE OF LLOYD BUCHER,<br>DECEASED,<br><br>   Plaintiffs,<br><br>  vs.<br><br>THE GOVERNMENT OF THE<br>DEMOCRATIC PEOPLE'S REPUBLIC OF<br>KOREA, its Ministries, Agencies and<br>Instrumentalities,<br><br>   Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Court No. 1:06 CV00749(HHK) |

## <u>PLAINTIFFS' PROPOSED FINDINGS OF FACT</u>
## <u>AND CONCLUSIONS OF LAW</u>

   Come now Plaintiffs, William Thomas Massie, Dunnie Richard Tuck, Donald

Raymond McClarren and Rose Bucher, Individually and as the duly appointed Personal

Representative of the Estate of Lloyd Bucher, Deceased, by and through counsel, and

respectfully submit their Proposed Findings of Fact and Conclusions of Law.

          Respectfully submitted,


       By:  Richard H. Streeter /s/_____
          Richard H. Streeter
          D.C. Bar No. 946053
          James R. Sweeney II
          D.C. Bar No. 462763
          BARNES & THORNBURG LLP
          750 17th Street, NW, Suite 900
          Washington, DC  20006
          Telephone:  (202) 408-6932
          Facsimile:  (202) 289-1330

Dated:  June 16, 2008

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WILLIAM THOMAS MASSIE<br>DUNNIE RICHARD TUCK<br>DONALD RAYMOND MCCLARREN<br>ROSE BUCHER, Individually and as the duly<br>appointed Personal Representative of the<br>ESTATE OF LLOYD BUCHER,<br>DECEASED,<br><br>　　　　Plaintiffs,<br><br>　　vs.<br><br>THE GOVERNMENT OF THE<br>DEMOCRATIC PEOPLE'S REPUBLIC OF<br>KOREA, its Ministries, Agencies and<br>Instrumentalities,<br><br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Court No. 1:06 CV00749(HHK) |

PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW

I.　　FINDINGS OF FACT

A.　　INTRODUCTION AND BACKGROUND

This action is brought by three U.S. citizens, joined by the widow of a fourth U.S.

citizen, seeking damages for tortious injuries done to them in the course of their

kidnapping, imprisonment and torture while being held hostage by Ministries, Agencies

and Instrumentalities of the Government of the Democratic People's Republic of Korea

("North Korea"), between January 23, 1968 and December 23, 1968, in North Korea.

Jurisdiction is predicated on the terrorism exception to the Foreign Sovereign Immunities

Act ("FSIA"), 28 U.S.C. § 1605(a)(7).

The action arises from the illegal seizure by North Korea of the U.S.S. Pueblo

(AGER-2) ("Pueblo") and the taking of the Pueblo's Commander and crew as hostages

and their subsequent eleven-month ordeal.  Plaintiffs include Commander Lloyd Bucher, deceased, William Massie, Donald McClarren and Dunnie Tuck.  In addition, Rose Bucher brings this action individually and on behalf of the estate of her deceased husband, Commander Lloyd Bucher.  Defendants are the Government of the Democratic People's Republic of Korea, its Ministries, Agencies and Instrumentalities.

**Hijacking of the U.S.S. Pueblo in International Waters.**

1.      On January 23, 1968, the Pueblo, which was engaged in electronic surveillance and other activities, sat dead in international waters in the Sea of Japan, approximately 25 miles from Wonson, North Korea and 15.6 miles from the nearest land, North Korea's Ung-Do island.  *See*, Exhibit 15 (hereinafter "Ex. 15"), at p. 121, ¶ 15; Transcript Day 2, Testimony of Dunnie Tuck (hereinafter "Tuck Tr."), at pp. 12-15.

2.      The Pueblo had no armor protection and was lightly armed with two .50 caliber machine guns, ten Browning semi-automatic rifles and a handful of .45 caliber handguns.  *See*, Ex. 15, at p. 113, ¶¶ 164-174.

3.      The Pueblo was manned by a crew of 83, which consisted of U.S. Navy personnel (including Plaintiffs William Massie, Donald McClarren and Commander Lloyd Bucher), National Security Agency personnel and two civilian oceanographers (which included Plaintiff Dunnie Tuck).  *See*, Tuck Tr., at p. 16; Transcript Day 1, Testimony of Donald McClarren (hereinafter "McClarren Tr."), at p. 44.

4.      About noon on January 23, 1968, the Pueblo was approached by a North Korean SO-1 class subchaser, hull number 35 ("SC-35").  SC-35 was at general quarters and its deck guns – a 3-inch cannon and two 57 mm gun mounts—were manned and trained on the Pueblo.  *See,* Ex. 15, p. 122, ¶ 221.

5.      At 12:12, SC-35 signaled "What nationality."  In response, Commander Lloyd Bucher ("Cdr. Bucher") ordered the ensign raised and then a flag indicating that the Pueblo was engaged in hydrographic research. *See,* Ex. 15, p. 122, ¶¶ 228-29; Tuck Tr., p. 15.

6.      At 12:20, three North Korean P-4 motor torpedo boats were seen approaching the Pueblo from the direction of Wonson, North Korea.  *See,* Ex. 15, p. 123, ¶ 232.

7.      Then, at 12:27, on its third swing around the Pueblo, SC-35 hoisted a new signal:  "Heave to or I will open fire on you."  The Pueblo, after confirming its location, signaled that "I am in international waters."  *See,* Ex. 15, p. 123, ¶¶ 233-34.

8.      By 12:35, the torpedo boats arrived and took up positions around the Pueblo while two snub-nosed MiG-21s began menacingly circling the Pueblo.  *See,* Ex. 15, p. 123, ¶¶ 240-243; Tuck Tr., p.16.

9.      Shortly thereafter, new flags were hoisted on one of the torpedo boats: "Follow in my wake.  I have pilot aboard."  Then a boarding party transferred from the SC-35 to one of the torpedo boats, PT-604, which began backing toward the Pueblo's starboard bow with fenders rigged.  Men in helmets with rifles and fixed bayonets stood on PT-604's deck.  The signal was repeated:  "Heave to or I will open fire."  *See,* Ex. 15, pp. 123-24, ¶¶ 246-47.

10.     In response, Cdr. Bucher hoisted the signal:  "Thank you for your consideration.  I am departing the area."  *See,* Ex. 15, p. 124, ¶ 249.

11.    Cdr. Bucher then gave the order to get under way at one-third speed.  As the Pueblo began moving, the torpedo boats began crisscrossing the ship's bow and SC-35 again signaled, "Heave to or I will fire."  *See,* Ex. 15, p. 124, ¶¶ 252, 254.

12.    After Cdr. Bucher ordered the speed of the Pueblo increased to full speed, SC-35 gave chase while sailors aboard one of the other torpedo boats, PT-601, uncovered a torpedo tube and trained it on the Pueblo.  *See,* Ex. 15, p. 125, ¶ 257.

13.    At this point in time, SC-35 directed all North Korean vessels to clear the area and announced that it was going to open fire on the Pueblo because it would not comply with North Korean navy instructions.  Seconds later, SC-35 commenced firing its 57mm guns and the torpedo boats began firing their 30mm guns.  No attempt was made to man the Pueblo's 50mm guns in order to return fire.  Although most of the heavy machine gun rounds were aimed over the Pueblo, its signal mast was struck and Cdr. Bucher collapsed with small shrapnel wounds in his ankle and rectum.  *See,* Ex. 15, p. 125, ¶¶ 260-266.

14.    Recognizing that there was no escape, Cdr. Bucher, at 1:34, gave the command "All stop" and the signalman was ordered to hoist the international signal for "Protest."  The 57mm fire halted but the 30mm fire continued sporadically.  *See,* Ex. 15, p. 126, ¶ 278.

15.    After briefly resuming movement, Cdr. Bucher, at about 2:30, once again ordered another "All Stop."  Almost immediately, SC-35 closed to a range of about 2,000 yards and fired.  This round of firing caused the death of a Pueblo crew member, Fireman Duane Hodges.  *See,* Ex. 15, p. 127, ¶ 294; McClarren Tr., p. 19.  All told, upward of 2,000 rounds had struck the Pueblo.  *See,* Ex. 15, p. 144, ¶ 426.

**The Pueblo Is Boarded And Its Crew Taken Hostage.**

16.    At 2:32, a group of two North Korean officers and eight to ten enlisted men armed with AK47 assault rifles boarded the Pueblo. *See,* Ex. 15, pp. 129-30, ¶¶ 320, 323.

17.    They forcibly gathered members of the Pueblo crew on the well deck of the Pueblo, where the temperature was below freezing, and forced them to sit blindfolded with their hands and ankles tightly bound. *See,* McClarren Tr., pp. 20-21; Transcript Day 1, Testimony of William Massie (hereinafter "Massie Tr."), at p. 72; Tuck Tr., pp. 25, 27.

18.    If a crewmember resisted, the North Koreans spontaneously punched, kicked or jabbed them with their weapons. *See,* Tuck Tr., p. 27.

19.    After some time had passed, the crew members were pulled to their feet and taken inside of the Pueblo where Massie, along with the other crew members, were forced to sit on the floor in several inches of icy sea water. *See,* Massie Tr., pp. 73-74.

20.    At about 4:00, a second boarding party arrived with a senior North Korean colonel and a civilian pilot, who relieved the Pueblo's helmsman. Following an inspection of the ship by the North Koreans accompanied by Cdr. Bucher, Cdr. Bucher was ordered to sit on the deck outside his cabin. *See,* Ex. 15, p. 131, ¶ 343.

**Arrival at Wonson, North Korea.**

21.    At about 8:30 p.m. on January 23, 1968, the Pueblo was tied up at a pier about ten miles northwest of Wonson and Cdr. Bucher was interrogated by several high-ranking North Korean officers.  *See,* Ex. 15, p. 132, ¶ 359.

22.    When the interrogation was finished, the crew was dragged off of the ship and, while bound and blind-folded, forced to walk over a thin gangplank approximately 8 to 10 inches wide onto North Korean soil.  *See*, McClarren Tr., p. 22; Massie Tr., pp. 74-75; Tuck Tr., p. 30.  They were then led in front of an unruly crowd of North Koreans who were yelling insults and spitting at the crew.  In addition, the guards kicked them in the legs and karate-chopped them.  *See*, Ex. 15, p. 146, ¶ 434; Massie Tr., pp. 75-76.

23.    The crew was taken from the Wonson pier to a small building where they were beaten and mistreated in an effort to have them admit that they were South Korean spies.  See, Ex. 15, p. 147, ¶ 436.

24.    At this small building, Massie, who was still blindfolded, was shoved into an iron stove.  When he tried to cover his face from the heat and flames, Massie sustained burns to his hands.  *See*, Massie, Tr., p. 76.

25.    While still blindfolded, the crew was forcibly put into buses with covered windows and was driven to a train station.  En route to the train station, the buses stopped at several places where North Korean civilians came aboard to beat and yell at the crew.  The North Korean officials also continued to beat the crew on the way to the train station.  *See*, Tuck Tr., pp. 31, 33; Massie Tr., p. 77; McClarren Tr., p. 23.

26.    When they arrived at the train station, the captives were pulled from the buses.  They remained blindfolded while being kicked and beaten with rifle butts and fists in front of another hostile crowd before being loaded onto a train that would

transport them to Pyongyang, where they would be held for six weeks.  *See,* Tuck Tr., p. 31; McClarren Tr., p. 23.

27.    While on the train en route to the first detention site, the crew was continually mistreated, kicked, prodded with rifle butts, slapped and punched by guards. McClarren Tr., p. 24; Tuck Tr., p. 33; Massie Tr., p. 77.

28.    Several interrogations were conducted while in transit on the train and accusations of espionage were made by the captors.  *See*, Ex. 15, p. 147, ¶ 437; McClarren Tr., p. 24.

29.    During the 10 hour train ride, civilians on the train were allowed to beat, spit on and slap and otherwise humiliate the captives, who remained blindfolded and bound.  *See*, Tuck Tr., pp. 33-34.

30.    During the train ride, Cdr. Bucher was questioned six or seven times, receiving rifle butts to the back for unacceptable answers.  Cdr. Bucher requested the entire crew be treated in accordance with the precepts of the Geneva Convention, but his requests were ignored.  He was told by the captors that the Geneva Convention did not apply because the crew was held as civilian prisoners in violation of North Korean criminal espionage laws.  *See*, Ex. 15, p. 147, ¶ 438.

31.    Upon arriving in Pyongyang, North Korea, the captives had their hands untied and the blindfolds removed.  At the train station, Cdr. Bucher and the officers were marched off first with their hands held up, followed by the remaining crew members. The event was heavily covered by the North Korean press.  *See,* McClarren Tr., p. 28; Tuck Tr., p. 35; Massie Tr., p. 77.

32.     The captives were then placed on a bus.  As had been the case with the train, the bus windows were covered so that it was impossible for the captives to see where they were being taken or otherwise know their fate.  *See,* McClarren Tr., 29; Tuck Tr., p. 35.

**Compound I (the "Barn").**

33.     The captives were transported to a "prison" building on the outskirts of town, which the crew nicknamed the "Barn." The crew was held hostage for the next six weeks at the Barn.  When the buses arrived at the Barn in the early morning hours of January 24th, the captives were separated into rooms as they filed into the building.  The heating system was off despite the severe winter cold, bare light bulbs provided constant illumination and deprived the prisoners of sleep, the windows were covered depriving the prisoners of any situational awareness, and the hallways were dim.  The atmosphere was one of severe cold, pierced by yelling, stomping, pounding and screaming.  There was no running water.  *See*, Ex. 15, p. 150, ¶ 452; Massie Tr., pp. 99-100.  McClarren Tr., p. 30.

34.     The crew was held in rooms with four men to a room.  Each room had four cots, a table and four chairs. *See,* Tuck Tr., pp. 36-37; Massie Tr., p. 77; McClarren Tr., pp. 29-30.  During the day, the captives had to sit at painful attention with their fists clenched down to their sides and their shoulders thrown back as far as possible.  Their necks were shoved down as far as they could hold them and if the guards did not think it was far enough, they would push the heads down to the point where the captives had difficulty breathing.  *See,* Massie Tr., p. 99.

35.     Rats were in the hallways and in the bathroom.  *See,* Massie Tr., p. 99. As a result of bed bug bites, Plaintiff Massie developed a severe infection that caused his

leg to become inflamed and swollen. After the leg had swollen to twice its normal size, a North Korean doctor, without the use of an anesthetic, sliced it open with a pocket knife in order to drain the infection and swab the opened area of the leg with some type of medicine. Because Massie was unable to control the movement of his leg, one of his captors sat on his stomach while two others held his legs down on the table on which he had been placed. *See,* Massie Tr., pp. 101-103.

36.     During the six weeks they were detained at the Barn, the hostages were continuously tortured and beaten, often to the point of unconsciousness and were not allowed to speak to one another. *See,* Tuck Tr., pp. 37-38. If one was caught talking to another captive, they would be beaten unconscious. *See,* Massie Tr., p. 99-100.

37.     The hostages were not allowed to leave the building for any reason. However, on one occasion, Cdr. Bucher was taken to view the tortured body of South Korean spy who, according to the North Korean officials, did not cooperate with them. *See,* Ex. 15, p. 150, ¶ 452.

38.     The harsh treatment of the crew throughout the eleven months they were held hostage consisted of severe physical beatings with karate blows, broom handles, belt buckles, boards and chairs, along with punches with rifle butts and whatever else that was handy. *See,* Massie Tr., p. 103; Tuck Tr., p. 81. A common and extremely painful torture was to force the victim to kneel or squat with a board or stick behind his knees with a chair held above his head, keeping the body straight. *See,* Ex. 15, p. 150, ¶ 457. The beatings were accompanied by intimidation and threats that they would be shot as spies if they did not confess. These threats created the constant fear of execution. *See, id.;* Tuck Tr., pp. 44-49, 51.

39.     On one occasion after McClarren was taken out of his room for interrogation, they put him on his knees and put a two-by-four between his knees and forced him to lay back.  After several hours, the guards came in and told him to get up on a chair.  Because he could not walk, he was forced to crawl in humiliation to the chair like a baby and climb onto it.  As he sat there, the officer that was behind the chair pulled out has gun and put it to his head and pulled the trigger.  When the trigger merely clicked, McClarren went blank.  *See,* McClarren Tr., p. 35.

40.     Another form of torture involved requiring the captives to stand against the wall with their arms held out straight.  Once the arms started to fall, the guards would come up and hit the captives.  When they could no longer put their arms up, the guards would beat them.  *See,* McClarren Tr., p. 38.

41.     During the course of being interrogated a day or so after arriving at the barn, Tuck, who was a civilian, was told that he would be shot because he was an FBI spy and not protected by the Geneva Convention.  *See,* Tuck Tr., p. 42.  He was then asked what he thought of that.  In response, he pulled out a dime and told the interrogators that if they would take him to Panmunjom and let him call President Johnson, the situation could be straightened out.  *Id.* at 44.  At that point, one of the North Korean officers jumped over the table at which he was seated, grabbed a rifle from the guard who was standing next to Tuck and used it to bust Tuck on his chin and knock him over the chair backwards.  The blow split Tuck's chin open.  *Id.* at 44-5.

42.     When the captives were allowed to go to the toilet to relieve themselves, the guards routinely administered karate kicks on the way to and from the toilet.  *See,*

McClarren Tr., pp. 36-38; Massie Tr., pp. 114-15; Tuck Tr., p. 46.  This harsh treatment lasted throughout the period of captivity.  *See*, Tuck Tr., pp. 55-56.

43.     It became clear that the physical beatings and threats were to elicit confessions from the hostages that they were spying on North Korea in North Korean waters and not international waters when the ship was hijacked.  *See*, Tuck Tr., p. 38

44.     For 40 days, the crew was not given an opportunity to shower, change clothes or shave.  They were covered in their own blood and in some case, their own feces.  *See*, McClarren Tr., p. 30; Massie Tr., p. 100.

45.     Food was very poor in quantity and quality and lacked proper vitamin and nutritional content.  In caloric content it was marginally able to sustain life (about 500 calories per day).  Rice, bits of fish, turnip soup, bread and butter accounted for the bulk of the diet.  Meals were served in buckets in a most unsanitary manner.  *See*, Exhibit 11 (hereinafter "Ex. 11"), at pp. 5-6; Ex. 15, p. 150, ¶ 453; Massie Tr., pp. 98-99; Tuck Tr., p. 70.  During the eleven months they were held hostage, Cdr. Bucher lost approximately 50 pounds.  *See*, Transcript Day 2, Testimony of Rose Bucher (hereinafter "Bucher Tr."), at p. 118.  Massie lost 51 pounds. *See*, Massie Tr., p. 99.  Tuck lost 37 pounds.  *See*, Tuck Tr., p. 90.

**Interrogation of Cdr. Bucher.**

46.     Immediately after Cdr. Bucher arrived at the Barn on the morning of January 24, he underwent interrogations during which he and his crew were accused of being spies.  The North Koreans repeatedly told him that he and his crew would be treated as civilian espionage agents, tried under Korean law and shot at sundown.  In

almost every interview, the North Koreans demanded that he sign a typed confession that he was a spy and a member of the Central Intelligence Agency ("CIA") and was trying to start a war. He refused to sign. Ex. 15, p. 148, ¶¶ 440-41.

47.    About noon, Cdr. Bucher had his first direct interview with the officers who would be in charge of the captives throughout their entire confinement. This officer, nicknamed "Super C" because he was a senior colonel (later renamed "GG" for "Glorious General" after he was promoted), was considered to be highly intelligent, competent, but cruel. At one stage in the interrogations, Cdr. Bucher was confronted with classified publications removed from the ship, including his own narrative log. *Id.* At about eight p.m. of the first day at the Barn, Cdr. Bucher was again taken to an interrogation room. "Super C", another officer with a drawn pistol, a third officer, two or three enlisted men with bayonets fixed to their guns, and several interpreters were there. Again, Cdr. Bucher was told to sign the typed confession. When he refused, he was told to sign or he would be shot. *See*, Ex. 15, p. 148, ¶ 441. He was then made to kneel on the floor with the officer whose pistol was drawn behind him and the third officer in front. While kneeling on the floor, he repeated the phrase "I love you, Rose" over and over to keep his mind off of what was to come. *See*, Bucher Tr., p. 110. At the end of two minutes, the officer in front of him was ordered to move aside and "Super C" said "Kill the son-of-a-bitch." Although the trigger was pulled, the gun did not discharge a bullet. *Id.*

48.    At about 10:30 p.m. on January 24, Cdr. Bucher, having not eaten or slept for a day and a half, was returned to the same interrogation room and told that he would now see what happened to spies. He was led to a staff car and driven to a building about

ten minutes away. There he was shown a man, allegedly a South Korean, who was strapped to the wall and had undergone intensive physical torture. The victim's head was badly swollen, one eye hung out of its socket and broken bones were evident. Cdr. Bucher was so shocked to see the results of a human being having been so tortured that he was unable to remember leaving the building and being returned to the Barn. The next thing he remembered was being told "Now you know what happens to spies." *See*, Tuck Tr., p. 39.

49.     About 45 minutes later, Cdr. Bucher was taken again to an interrogation room. During this session he was ultimately informed that the North Koreans would begin shooting his crew, in his presence, one by one, beginning with the youngest, and that after all had been killed, they could, and would, be able to make him sign the confession before killing him. He was told that his interrogators had already sent for Engineman Fireman Howard E. Bland. When Bland was brought into the room, Cdr. Bucher was convinced that the North Koreans would carry out the threat and that he was not prepared for this type of mental torture. He therefore signed the confession. *See*, Ex. 15, p. 148, ¶ 441; Tuck Tr., p. 40-1. According to Massie, who saw him shortly after the beating, Cdr. Bucher was barely recognizable as his face was swelled up, his eyes puffed out and he walked with a terrible limp. Massie Tr., p. 104.

**Interrogation of the Crew Members In Order To Obtain Forced Confessions For Use In Propaganda.**

50.     The North Koreans were primarily interested in obtaining confessions and personal history statements for international propaganda purposes. *See* Ex. 15, p. 155, ¶ 490. Immediately upon arrival at the Barn, the North Koreans began their unrelenting

assault on the crew to get them to admit to crimes. Men were taken, in what seemed to be a random order, and interrogated about their jobs on the Pueblo, and why the Pueblo had intruded into its territorial waters and spied on North Korea. *See,* Tuck Tr., pp. 50-51. Because the North Koreans had the ship's personnel file, they knew the answers.

51.     Each man was told that he must admit his crimes if he hoped to live and someday see his family again. Fists, gun butts and kicks were accompanied with screams of "you will be shot as spies." The physical and mental brutality continued 24 hours a day as men were taken to and from interrogation rooms and beaten until they were unconscious. During the first few weeks of detention, individual threats of death, threats to kill others, severe beatings, torture, both physical and mental, and other means of coercion were employed by the North Koreans to obtain their desired objectives, namely to obtain propaganda instruments. *See*, Ex. 15, p. 150, ¶ 456, and p. 155, ¶ 493.

52.     The North Korean officials kicked, beat and threatened the crew viciously and repeatedly in order to force confessions. Massie Tr., p. 110. Massie was kicked repeatedly in the groin as well as kicked in the knees and ankles. The kicks to the groin have caused him a lifelong pain and suffering as well as documented impotency and the age of twenty-one. *See,* Massie Tr., pp. 82-84.

53.     Ultimately, confessions were obtained as a result of the repeated intimidation beatings, interrogation beatings and beatings to extract false confessions of guilt for operating a "spy" ship in North Korean territorial waters and espionage. Ex. 15, p. 155, ¶ 495.

**Compound II (The Farm – 42 Weeks of Beatings, Brain Washing and Propaganda).**

54.    On March 4, 1968, the hostages were moved to a site outside the city that they designated the "Farm." This facility was located on the outskirts of Pyongyang. *See*, Tuck Tr., p. 55; Ex. 15, p. 151, ¶ 459.

55.    Upon arriving at the second compound, the hostages were grouped in rooms of eight men, except for one room of four. Officers were placed in their own rooms. This period of detention lasted 42 weeks until December 23, 1968. *See*, Ex. 15, p. 151, ¶ 460.

56.    Although the living conditions were better, the hostages were provided inadequate rations of food and forced to live in unsanitary conditions. Personal hygiene was largely ignored. About every 6 weeks, each room was marched to the bathroom and given one basin of hot water with which to bathe. Each man's clothes consisted of the gray Nehru-type suit that was given to him before being moved to the compound. However, no means were provided to wash the clothing. *See,* McClarren Tr., p. 33.

57.    A cyclic pattern of calm and harassment was established as a form of mental and psychological terror. Throughout the time until late November, indiscriminate beatings continued. The officers and selected individuals were singled out for periodic torture to exert control over the captives and to coerce additional confessions for release to the world. *See* Ex. 15, p. 155, ¶ 493; Tuck Tr., pp. 55-56; McClarren Tr., pp. 34-35.

58.    In addition to the beatings and torture administered during interrogations, rough treatment was the rule and severe punishment resulted from infractions of confinement regulations. An atmosphere of terror and intimidation was prevalent

throughout detention.  While most of the severe beatings were under the direct orders of officers, there were occasions when enlisted North Korean men would initiate beatings without the knowledge of officers.  *See,* Ex. 15, p. 155, ¶ 496.

59.    The North Korean officials used many techniques for harassment and torture.  One method was to kick the hostages' ankles as they walked.  McClarren Tr., pp. 34-5.  The hostages were also threatened with being shot.  Massie Tr., p. 82.  In one instance, a North Korean officer put a gun to McClarren's head and pulled the trigger.  Although the hammer only "clicked", it instilled extreme fear and terror.  McClarren, Tr., p. 35.

60.    When the captives were allowed to go to the toilet to relieve themselves, the guards routinely administered karate kicks on the way to and from the toilet.  Throughout the period of captivity, they were beat with rifle buts, punched in the head and kicked in the ankle.  The hostages were always anxious, fearful and nervous about the next beating, indeed about answering the next call of nature (an essential, basic human freedom of which they were deprived), feeling constant guilt and not being able to help the other crew members.  *See*, McClarren, Tr., pp. 37-39; Tuck Tr., p. 56.

61.    The North Koreans used extreme mental pressures to enforce the rules, such as the "no talking" rule.  While marching back to his room, Massie asked the Pueblo's Operations Officer whether he had heard any news.  This was overheard by the guards.  After Massie entered his room, he was confronted by a particularly large guard known as the Bear, who began screaming at Massie while pointing his AK-47 at Massie's head.  He then indicated that Massie was to open his mouth.  When Massie complied, the Bear stuck his AK-47 into Massie's mouth, ejected his clip and flipped out a bullet to

show that it was loaded.  He reinserted the clip and then put his finger into the trigger guard while he continued to scream at Massie.  Finally, he pulled the gun out of Massie's mouth and swung it around hitting Massie alongside his head knocking him over a bunk and onto the floor.  *See*, Massie Tr., p. 81.

62.    On another occasion, Massie was beaten unconscious because he refused to sign a document that the North Koreans wanted to send to his family.  The beatings, which included being kicked in the stomach, back and groin, were followed by the threat that he would be shot.  *See,* Massie Tr., p. 82.

63.    Throughout the period that the crew was held hostage, North Korea was engaged in a prolonged effort to extract a public apology from the United States Government for the Pueblo intruding into North Korea's territorial waters and for spying on North Korea.  As part of this effort, the hostages were also forced to participate in staged press conferences held August 13 and September 12.  *See*, Tuck Tr., p. 56; Ex. 15, p. 155, ¶ 490.

64.    The latter press conference was an international (communist) press conference.  At both sessions, the Pueblo's crew inserted innuendos and archaic and corny language into the prepared statements to discredit the propaganda.  *See*, Tuck Tr., pp. 57-58.

65.    In addition, the North Koreans pressured the hostages to write false and humiliating letters home to family, friends and members of Congress reporting the humane treatment they were receiving and asking that the United States apologize for the spying and intrusions into North Korean waters.  *See,* Ex. 15, p. 153, ¶ 477 and p. 157, ¶¶

506-509.  Hostages who resisted were severely beaten until they complied.  *See*, Ex. 15, p. 157, ¶ 506.

## HELL WEEK

66.     During the period that they were held hostage, the Pueblo's crew was subjected to North Korean propaganda films.  In June 1968, two short subjects were shown in which it became apparent that the North Koreans did not know what the middle finger gesture meant.  This knowledge became an integral part of the crew's anti-propaganda campaign, which caused the crew to feel that they had achieved a victory, albeit a small one, by spoiling the North Korean's propaganda by humiliating them on a world stage.  *See,* McClarren Tr., p. 42; Massie Tr., p. 107.

67.     When asked what the finger meant, the crew deceived the North Koreans by explaining that it was the "Hawaiian Good Luck Sign."  This would later result in two weeks of severe beatings and torture of every hostage in early December.  *See*, Tuck Tr., p. 58.

68.     The October 18 issue of *Time Magazine* exposed the true meaning of the "Hawaiian Good Luck Sign."  In late November or early December, the North Koreans learned that the middle finger gesture, which had been shown in many pictures and videos, was an obscene gesture.  *See*, Tuck Tr., p. 58; Massie Tr., p. 107.

69.     When they learned that they had been discredited by the displaying of an obscene gesture in their propaganda photographs, the North Koreans were enraged.  Commencing in early December, the North Koreans began a campaign of beatings, harassment, and interrogations so intense and concentrated that the hostages referred to it

as "Hell Week".  *See,* Ex. 15, p. 156, ¶ 502.  Hell Week actually lasted about two weeks.  *See*, Ex. 15, p. 156, ¶ 502; Massie, Tr., pp. 108-112.

70.     During Hell Week, the hostages were forced into rooms of 16 men per room.  *See,* Tuck Tr., p. 58; Massie Tr., p. 108.  They were subjected to cold rooms, open doors, constant surveillance, lights on at night, sleep deprivation, and a more rigid enforcement of all rules.  They were required to sit in a chair at all times with their heads bowed unless they had specific permission to do otherwise.  *See,* Ex. 15, p. 156, ¶ 503.

71.     The hostages were subjected to even more mental anguish as they thought they were going to be killed because they had served their purpose as propaganda puppets.  Because of the crowded conditions, they would bump into each other's beds, which further aggravated the mental state of the hostages and prevented them from sleeping.  *See,* Tuck Tr., pp. 59-60.

72.     The hostages were savagely beaten by the North Koreans for several hours at a time during the two weeks of Hell Week and were subjected to other harsh methods to get them to "confess" as to the identity of the instigators behind the deception of their captors.  *See*, Ex. 15, p. 156, ¶¶ 503-04; Massie Tr., pp. 108-112.

73.     During Hell Week, the guards repeatedly jumped on Tuck's back after he was forced to the floor.  He was also forced to hold up a chair while the guards beat him in the stomach and back.  When he dropped the chair, the guards beat him with it until it broke.  They then used broomsticks as a substitute.  The beatings ranged from karate chops to rifle butts to kicks to the groin.  *See*, Tuck Tr., pp. 58-59.

74.     Like most other hostages, Massie was dragged out of his room and beaten with weapons ranging from belts, boards, boots and buckles.  He had his arms pulled

back and a two-by-four placed though them.  He was then beaten in the stomach and kicked throughout the shoulders and arms.  He also had to hold a chair over his head until he couldn't hold it any more.  Then he was kicked.  *See,* Massie Tr., p. 109.  The hostages were beaten so badly that the torture rooms were covered in blood.  Each  succeeding hostage was forced to clean up the blood of the preceding hostage before having their own blood spread over the walls and floor for the next hostage to clean up.  *See*, Massie Tr., p. 108-09.

**<u>Release of the Hostages.</u>**

75.    The beatings came to an abrupt halt in mid-December.  On December 19, Glorious General met with the hostages and restored their basic privileges.  The hostages were given one more opportunity to repent, be sincere and write a new confession. Wounds were treated and the hostages were given hard boiled eggs to roll on their bloodshot eyes to break up the clots caused by the beatings.  Because of his extreme hunger, Tuck ate his egg.  Tuck Tr., p. 62.  On December 22, Glorious General advised the hostages that the United States was apologizing.  *See*, Tuck Tr., pp. 61-62; Massie Tr., p. 113.

76.    Shortly thereafter, a new set of clothes was distributed to the hostages. *See,* Massie Tr., p. 118; Tuck Tr., p. 62.

77.    This was followed by a night train ride to Kaesong, and then by bus to the border at Panmunjom and final repatriation at noon on December 23, 1968.  *See,* Ex. 15, p. 154, ¶ 481; Tuck Tr., p. 67.

78.    At Panmunjom, the hostages crossed the "Bridge of No Return" in single-file order with Cdr. Bucher verifying each man's identity as he crossed, as well as the

body of the crew member who was killed on the Pueblo during its capture in January 1968. *See,* Tuck Tr., p. 65. The North Korean threatened them one last time saying that if they said or did anything as they crossed the bridge, the remaining men waiting to cross would be shot. *See,* Massie Tr., p. 113. Lending credence to this threat, the men were warned to maintain 15-yard gaps between each other and walk at a constant pace. The crew crossed bridge in order of rank, from lowest to highest, except for Cdr. Bucher who crossed first. *See,* Ex. 15, p. 154, ¶ 482; Tuck Tr., p. 69; Massie Tr., p. 113.

79.     After crossing the bridge, the men were greeted by U.S. Military personnel and given their first decent meal in eleven months. *See,* Tuck Tr., p. 70.

**B.     DAMAGES SUFFERED BY THE INDIVIDUAL PLAINTIFFS.**

**William Thomas Massie**

1.     William Thomas Massie (hereinafter "Massie") is a United States citizen and a domiciliary of the State of Illinois. At the time he was taken hostage on January 23, 1968, Massie was only 20 years old. He held the rank of a Machinist Mate 3rd Class. *See,* Massie Tr., p. 65.

2.     During the course of the Pueblo being hijacked and the eleven months of being held hostage until his release on December 23, 1968, Massie was beaten and tortured and subjected to constant mental and psychological terror on a daily basis.

3.     Massie was repeatedly beaten unconscious. As a result of being kicked in the stomach, back, ankles, and knees, Massie sustained severe and permanent physical injuries, including herniated disks, pain in the legs, arms and back, ringing in the ear and impotency. Massie continues to suffer constant pain in his legs, arms and back. As a result of being repeatedly kicked in the groin, Massie was rendered impotent at the

unnatural age of twenty-one, which resulted in a failed marriage and multiple failed relationships.  Massie Tr., pp. 81-85.

4.      Massie suffers from Post Traumatic Stress Disorder, disability and disfigurement as a result of the injuries he suffered while being held hostage by the North Koreans.  Although he suffers from numerous disabilities stemming from his captivity, he has been rated at one hundred percent disability for PTSD alone, with lesser percentages for other disabilities related to his captivity that do not serve to increase his disability rating.  *See,* Massie, Tr., p. 86; Exhibits 7-9.

5.      Since his release from captivity, Massie has suffered lost wages and diminished earning potential.  He has also incurred substantial medical expenses on account of his injuries.  At present, he takes a substantial number of prescribed medications to ease the pain.  *See,* Massie, Tr., pp. 93-4; Exhibit 10.  Massie consistently has nightmares, cold sweats at night, cannot tolerate people walking behind him, tight fighting clothes and loud noises.  *See,* Massie, Tr., p. 88.

6.      Immediately following his release, Massie could not celebrate but was numb and in shock as to what he had just been through.  Massie, Tr., pp. 120-21.  Since his release from captivity, Massie spent decades seeking treatment and care for his PTSD and physical pains through the Veterans Affairs hospitals.  *See*, Massie Tr., pp. 84-88, 121; Exhibits 7-9.

7.      For over 39 years, Massie has suffered great pain and agony of mind and body.  Along with his constant pains in his body and impotency, an ongoing source of humiliation suffered at the hands of his tormentors, Massie suffers from a short temper that he did not have before his time in captivity and admits to being a vengeful man since

his release.  Massie maintains extreme hate and resentment for the defendants.  *See*, Massie Tr., pp. 86-87, 119.

8.      During the eleven months of captivity, Massie lost about 51 pounds of weight due to the stress and inadequate nourishment. *See*, Massie Tr., p. 99.

9.      During the eleven months of captivity, Massie was deprived of his basic human rights because he was deprived of his freedom and was prevented from partaking in his normal activities, including being able to go to the bathroom without being repeatedly beaten and the accompanying trepidation and fear of suffering those beatings merely for engaging in one of life's basic needs and freedoms.  Massie, Tr., pp. 114-5. At no time did Massie ever consent to being held in captivity, or to being touched, beaten, intimidated or terrorized.  Any such contact was both harmful and offensive and has caused lasting physical and mental damage and injury.

10.     After his release from captivity, Massie received the Purple Heart and the Prisoner of War Medal.  *See*, Massie Tr., pp. 69-70.  The Purple Heart is awarded in the name of the President of the United States to any member of the Armed Forces who, while serving the Armed Forces, has been wounded or killed or who has died or may die after being wounded while being held as a prisoner of war or while being taken captive. *See,* Exhibit 1, p. 2.

**Dunnie Richard Tuck**

11.     Dunnie Richard Tuck (hereinafter "Tuck") is a United States citizen and is currently a domiciliary of the State of Mississippi.  Immediately prior to being assigned to the Pueblo, Tuck was domiciled in the Commonwealth of Virginia.  *See*, Tuck Tr., p. 7.

12.    At the time he was taken hostage on January 23, 1968, Tuck was one of two civilian oceanographers aboard the Pueblo conducting oceanographic surveys. Tuck was employed by NAVOCEANO, a Naval Oceanographic Office under the Department of the Military. *See*, Tuck Tr., p. 8.

13.    During the course of the Pueblo being hijacked and the period of eleven months of being held hostage until his release on December 23, 1968, Tuck was beaten and tortured and subjected to constant mental and psychological terror on a daily basis. *See,* Tuck Tr., pp. 55-56.

14.    Because Tuck was in civilian clothes at the time he was hijacked, he was initially considered to be an FBI "Spy" by the North Koreans and was threatened to be shot because he was not protected under the Geneva Convention. *See,* Tuck Tr., p. 41-42. Because civilians do not fall under the Geneva Convention rules, Tuck was aware that he could be shot immediately. This fear of execution loomed over his head throughout his incarceration and caused him severe emotional distress. *See*, Tuck Tr., pp. 41-44, 50-51. Tuck eventually convinced the North Korean officials that he was an oceanographer and not a spy after providing them with an, albeit false, organizational structure of the Naval Oceanographic Office. *See*, Tuck Tr., p. 52.

15.    Tuck sustained severe and permanent physical injuries as a result of being held hostage for eleven months, including permanent injuries to his back, permanent injuries to his ankles and knees brought on by all the kicks, and ringing in his ears. As a result of repeated butts with rifle butts and kicks to his lips, his lips periodically split open. *See,* Tuck Tr., p. 52. Because of the extremely harsh treatment that he received during Hell Week, including having guards jumping on his back and being beaten with

chairs and broomsticks, Tuck continues to experience back pains and back stress to this date. *See,* Tuck Tr., pp. 58-59.

16.    Tuck has been suffering from Post Traumatic Stress Disorder, disability and disfigurement, lost wages and earning potential and has incurred medical expenses on account of his injuries.  The constant beatings throughout captivity and the extreme beatings through Hell Week caused Tuck mental anguish, despair, hopelessness and constant fear of being shot. *See*, Tuck Tr., pp. 58, 60.

17.    Tuck continues to suffer great pain and agony of mind and body.  Years after being released from captivity, Tuck still suffers from general anxiety, flashbacks to his time in North Korea while asleep at night, waking up in cold sweats, and a lingering anxiety that a sharp noise or a bump on the bed could signify that this is the end. *See*, Tuck Tr., pp. 59-60.  Because he was serving his country as a civilian, Tuck was not eligible for assistance from the Veterans Administration and has had to cover his own medical expenses. *See,* Tuck Tr., pp. 85-86.  Moreover, although he suffers lasting disability as a result of being repeatedly and severely beaten while being held hostage by North Korea, there is no comparable civilian process available to adjudicate the degree of his disability or to award him disability payments.

18.    During the eleven months in captivity, Tuck lost about 37 pounds of weight due to the stress and inadequate nourishment.  Tuck Tr., p. 80.

19.    During the eleven months of captivity, Tuck was deprived of his basic human rights because he was deprived of his freedom and was prevented from partaking in his normal activities, including being able to go to the bathroom without being repeatedly beaten and the accompanying trepidation and fear of suffering those beatings

merely for engaging in one of life's basic needs and freedoms.  Tuck Tr., pp. 55-6.  At no

time did Tuck ever consent to being held in captivity, or to being touched, beaten,

intimidated or terrorized.  Any such contact was both harmful and offensive and has

caused lasting physical and mental damage and injury.

20.     After his release from captivity, Tuck received the Purple Heart and the

Prisoner of War Medal.  Tuck is one of very few civilians who have received the Purple

Heart.  *See,* Tuck Tr., pp. 74-75.

**Donald Raymond McClarren**

21.     Donald Raymond McClarren (hereinafter "McClarren")  McClarren is a

United States citizen and a domiciliary of the Commonwealth of Pennsylvania.  *See,*

McClarren Tr., p. 11.

22.     At the time he was taken hostage on January 23, 1968, McClarren was a

Petty Officer 2nd Class, or CT02, Communications Tech, Operator (teletype and crypto).

*See,* McClarren Tr., pp. 11-12.

23.     During the course of the Pueblo being hijacked and the period of eleven

months of being held hostage until his release on December 23, 1968, McClarren was

beaten and tortured and subjected to constant mental and psychological terror on a daily

basis.

24.     McClarren sustained severe and permanent physical injuries, including

arthritis in his back and shoulders from the beatings, deteriorating disks and severe pain

in his feet and ankles, which has resulted in his difficulty in wearing shoes.  *See,*

McClarren Tr., pp. 61-63.

25.     McClarren has been suffering from PTSD, disability and disfigurement. *See,* Exhibit 5.  McClarren continues to suffer great pain and agony of mind and body that is attributable to the psychological problems caused by his captivity in North Korea. From the moment he was captured until he was released in December 1968, McClarren remained scared and feared for his life.  Long after his release from captivity, McClarren still gets frightened at random, harmless occurrences, such as a door suddenly slamming, and cannot sleep in a totally dark room.  *See,* McClarren Tr., p. 27.  McClarren is short-tempered and becomes agitated if he feels something is not done correctly.  *See,* McClarren Tr., pp. 24-26.  He struggled through alcoholism for twenty years after returning from North Korea.  *See,* McClarren Tr., p. 25.  Due to his change in personality caused by the traumatic events associated with his captivity in North Korea, McClarren was married and divorced twice.  *See,* McClarren Tr., p. 60.  McClarren eventually received Veterans Affairs benefits to help him get counseling for his alcoholism and to treat his many physical and mental ailments.  *See*, McClarren Tr., pp. 24-26, 58, 60-63.

26.     During the eleven months of captivity, McClarren was deprived of his basic human rights because he was deprived of his freedom and was prevented from partaking in his normal activities, including being able to go to the bathroom without being repeatedly beaten and the accompanying trepidation and fear of suffering those beatings merely for engaging in one of life's basic needs and freedoms.  McClarren Tr., pp. 35-8.  At no time did McClarren ever consent to being held in captivity, or to being touched, beaten, intimidated or terrorized.  Any such contact was both harmful and offensive and has caused lasting physical and mental damage and injury.

27. After his release from captivity, McClarren received the Purple Heart and the Prisoner of War Medal. *See*, McClarren Tr., pp. 52-54.

**Commander Lloyd Bucher**

28. Commander Lloyd Bucher (hereinafter "Cdr. Bucher") was, prior to his death on January 28, 2004, a United States citizen and a domiciliary of the State of California. At the time he was taken hostage on January 23, 1968, Cdr. Bucher was the Commander of the USS Pueblo.

29. During the course of the Pueblo being hijacked and the period of eleven months of being held hostage until his release on December 23, 1968, Cdr. Bucher was severely beaten and tortured and subjected to constant mental and psychological terror.

30. During the eleven months that he was held hostage by North Korea, Cdr. Bucher sustained severe and permanent physical injuries which ultimately shortened his life. Bucher Tr., p. 108. As described by John H. Chafee, Secretary of the Navy, Cdr. Bucher was:

> illegally imprisoned by the North Koreans for eleven months. During that time, their food and living conditions were marginal. They suffered extensively from physical abuse and torturous treatment. Their captors refused to accord them even the minimal humane treatment required under international law. When they were released from their captive status, each showed great loss of weight and other marks of cruel treatment.

*See,* Ex. 11, pp. 5-6; Bucher Tr., p. 118.

31. Cdr. Bucher suffered from Post Traumatic Stress Disorder, disability and disfigurement and was classified as one hundred percent disabled by the Veterans Administration. Bucher Tr., p. 104. Until his death in 2004, Cdr. Bucher suffered great pain and agony of mind and body as a result of being held hostage. After his release

from captivity, Cdr. Bucher exhibited a changed personality and was extremely short-tempered with his wife and children, tense, nervous and would visibly shake after being startled from something as simple as a breeze slamming a door shut. At night, bumps of the bed or noises would disturb him and cause night sweats; he often could not go back to sleep. *See,* Bucher Tr., pp. 99-100, 103.

32.     The unlawful hijacking of the USS Pueblo also had an adverse impact on Cdr. Bucher's naval career by foreclosing his otherwise likely promotion to at least the rank of Captain in the U.S. Navy, and the financial benefit and prestige appurtenant thereto. Consequently, his career effectively ended by the North Korean's illegal seizure of the USS Pueblo, Cdr. Bucher was forced to retire from the Navy earlier than he had planned. *See*, Bucher Tr., pp. 107-08.

33.     During the eleven months of captivity, Cdr. Bucher lost about 50 pounds of weight due to stress and inadequate nourishment. *See*, Bucher Tr., p. 118. In addition, he suffered extreme mental anguish caused by the forcible surrender of his ship and crew and the ensuing severe, inhumane beatings suffered by his crew, which he was helpless to stop. *See* Massie Tr., p. 104-5; Bucher Tr., p. 127.

34.     During the eleven months of captivity, Cdr. Bucher was deprived of his basic human rights because he was deprived of his freedom and was prevented from partaking in his normal activities, including being able to go to the bathroom without being repeatedly beaten and the accompanying trepidation and fear of suffering those beatings merely for engaging in one of life's basic needs and freedoms. At no time did Bucher ever consent to being held in captivity, or to being touched, beaten, intimidated or

terrorized. Any such contact was both harmful and offensive and has caused lasting physical and mental damage and injury.

35.    After his release from captivity, Cdr. Bucher received the Purple Heart (with one gold star) and the Prisoner of War Medal. *See*, Bucher Tr., pp. 92-93.

**Rose Bucher**

36.    Rose Bucher is the widow of Cdr. Bucher and is the duly appointed Personal Representative of the Estate of Lloyd Bucher, Deceased.

37.    Rose Bucher has at all relevant times been a United States citizen and a domiciliary of the State of California.

38.    The unlawful conduct of North Korea, which included the kidnapping, torture, beating and prolonged detention and holding hostage of Rose Bucher's husband, Cdr. Bucher, caused Rose Bucher to lose and be deprived of the services, support, affection, consortium and companionship of her husband. During her husband's captivity, Rose Bucher missed her husband's presence, physical touch and loving words. In addition, she bore the burden of caring for her own family as well as the family members of the hostages, while being subjected to the extreme mental torment of not knowing whether she would ever see her husband again.

39.    While Rose Bucher did receive a few letters from Cdr. Bucher while he was in North Korea, she could tell that they were not his words, and just his handwriting. The letters were dictated by someone else. The letters only provided some relief to her constant stress and anxiety, as they indirectly informed her that her husband was alive. *See*, Bucher Tr., p. 109.

40.    After his release from captivity, Rose Bucher's husband remained distant with regards to talking to her about his feelings and thoughts of his time in North Korea. *See*, Bucher Tr., pp. 138, 141-42.  Nevertheless, he described the beatings and the torture, both physical and mental, to which he had been subjected.  This included, his description of the events of the first day of interrogation at the barn, including forcing him to kneel on the floor while threat was made to shoot him unless he confessed to being a spy. *See,* Bucher Tr., pp. 110, 125-6.

41.    Plaintiffs Massie, Tuck, McClarren, Rose Bucher and Cdr. Bucher were the victims of the terrorist activities of North Korea and its agents.  Such unlawful, terrorist activities included torture, assault, battery, kidnapping, false imprisonment and intentional infliction of emotional distress and loss of solatium.

## CONCLUSIONS OF LAW

1.    As this action is brought against a foreign state, the Foreign Sovereign Immunities Act of 1976, 28 U.S.C.A. §§ 1602-1611 et seq., as amended, controls. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 103 S. Ct. 1962 (1983); 28 U.S.C. § 1330.  The sole bases for subject matter jurisdiction in an action against a foreign state defendant are the enumerated exceptions to the Foreign Sovereign Immunities Act.  *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 109 S. Ct. 683 (1989).

2.    In the Anti-Terrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, § 221(c), 110 Stat. 1214, 1243, Congress lifted the immunity of foreign states officially designated by the Department of State as a state sponsor of terrorism, if

- 31 -

the foreign state commits a terrorist act or provides material support and resources to an individual or entity that commits such an act resulting in the death or personal injury of a United States citizen.  *See* 28 U.S.C.A. § 1605(a)(7), which provides that a foreign sovereign will not be immune to suit in U.S. courts when:

> money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

*See also* H.R. Rep. No. 383, 104th Cong., 1st Session 1995 at 137-38, available at 1995 WL 731698.

3.      Although Plaintiffs Massie, Tuck, McClarren and Cdr. Bucher were released from captivity more than twenty-five years prior to the enactment of the Anti-Terrorism and Effective Death Penalty Act of 1996, Congress has expressly directed the retroactive application of 28 U.S.C.A. § 1605(a)(7) in order to further a comprehensive counter terrorism initiative by the legislative branch of government.  *See* 28 U.S.C.A. § 1605 note (West Supp. 1997) ("amendments made by this subtitle shall apply to any cause of action arising before, on or after the date of the enactment of this act [April 24, 1996])."  Similarly, to the same effect, the ten-year statute of limitations for actions under § 1605(a)(7) does not bar the claims in this case because, once again, Congress has provided that victims of terrorism be given benefit of "all principles of equitable tolling, including the period during which the foreign state was immune from suit …"  28 U.S.C. § 1605(f).  Because North Korea was immune from suit by these Plaintiffs under the FSIA until the enactment of § 1605(a)(7) in 1996, the Complaint herein was duly and

timely filed on April 24, 2006.  A copy of the Complaint, which was translated into

Korean, was properly served with process pursuant to 28 U.S.C. § 1608(b)(3)(B), on

September 8, 2006.  Defendants have failed to respond or appear in the case.

        4.      To establish subject matter jurisdiction and subject a foreign sovereign to

suit under section 1605(a)(7), a claim must contain the following statutory elements:

> that personal injury or death resulted from an act of torture,
> extrajudicial killing, aircraft sabotage or hostage taking;
> and
>
> the act was either perpetrated by the foreign state directly
> or by a non-state actor which receives material support or
> resources from the foreign state defendants; and
>
> the act or the provision of material support or resources is
> engaged in by an agent, official or employee of the foreign
> state while acting within the scope of his or her office,
> agency or employment; and
>
> that the foreign state be designated as a state sponsor of
> terrorism either at the time the incident complained of
> occurred or was later so designated as a result of such act;
> and
>
> if the incident complained of occurred within the foreign
> state defendant's territory, plaintiff has offered the
> defendants a reasonable opportunity to arbitrate the matter;
> and
>
> either the plaintiff or the victim was a United States
> national at the time of the incident; and
>
> similar conduct by United States agents, officials, or
> employees within the United States would be actionable.

        5.      Plaintiffs have proved to the Court's satisfaction that they have satisfied

each one of the foregoing elements.  In addition, since her husband was a victim of the

terrorist acts of North Korea, as was she herself, this Court also has jurisdiction over the

claims of Rose Bucher.

6.      Sections 1605(e)(1) and (2) of the FSIA provides guidance with regard to interpreting the terms "torture" and "hostage taking."   Article One of the International Convention Against the Taking of Hostages defines the term "hostage taking" as:

> [a]ny person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an intentional intergovernmental organization, a natural or juridical persona, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offense of taking of hostages within the meaning of this Convention.

7.      "Torture" is defined in § 3 of the Torture Victim Protection Act of 1991, as the following:

> (a) the term 'torture' means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

> (b) mental pain or suffering refers to prolonged mental harm caused by or resulting from-

> the intentional infliction or threatened infliction of severe physical pain or suffering;

> the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

> the threat of imminent death; or

> the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality."

- 34 -

8.      Plaintiffs Massie, Tuck, McClarren and Cdr. Bucher have satisfied each of the requirements set forth above.  North Korea has been designated a state sponsor of terrorism, in part due to its unlawful seizure of the Pueblo.  *See* Public Notice 1048, U.S. Department of State, dated February 5, 1998, 53 FR 347701, 1988 WL 276528 (F.R.) ("In accordance with Section 6(j) of the Export Administration Act (50 U.S.C. App. 2405(j)), I hereby determine that North Korea is a country which has repeatedly provided support of acts of international terrorism."  George P. Shultz, Secretary of State).  *See also,* 134 Cong. Rec. H475-02, H. Con. Res. 246, *Condemning the Bombing by North Korean Agents of Korean Air Lines Flight 858* (Feb. 24, 1988) (expressing "the bipartisan support in the Congress for the sanctions imposed by the executive branch, including the addition of North Korea to the list of states supporting international terrorism which is maintained pursuant to section 6(j) of the Export Administration Act of 1979").

9.      The severe, coercive mistreatment to which they were subjected during their incarceration proves that Plaintiffs Massie, Tuck, McClarren and Cdr. Bucher were victims of "torture" as defined in section 3 of the Torture Victims Protection Act of 1991 (28 U.S.C. § 1350 note), pursuant to 28 U.S.C. §§ 1605(a)(7) and 1605(e)(1).  Similar conduct by United States agents, officials, or employees within the United States against the forces of a recognized sovereign State would be actionable.

10.      Because they were held by North Korea in an attempt to exact an apology from the United States for the alleged intrusion into North Korean territorial waters and to force them to confess to involvement with CIA activities and other false charges, Plaintiffs Massie, Tuck, McClarren and Cdr. Bucher were victims of "hostage taking" as

defined in Article 1 of the International Convention Against the Taking of Hostages, pursuant to 28 U.S.C. §§ 1605(a)(7) and 1605(e)(1).

11.    Plaintiffs Massie, Tuck, McClarren, Cdr. Bucher and Mrs. Bucher have suffered "personal injury" within the definition of 28 U.S.C. §§ 1605(a)(7) as the result of Defendants' actions of holding hostage and subjecting the crew to severe beatings and mental torture.

12.    Even though North Korea has failed to respond to the Complaint served on September 8, 2006 under section 1608 of the FSIA, North Korea, by letter dated March 27, 2008, has been provided an opportunity to arbitrate the claims at issue here.

13.    All of the plaintiffs herein were American citizens at the time that Massie, Tuck, McClarren and Cdr. Bucher were taken hostage and tortured.  They remained American citizens as of the date of trial.

14.    Once a foreign state's immunity has been lifted under section 1605 and jurisdiction is proper, section 1606 provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 1606.  As explained in *Price v. Socialist People's Libyan Arab Jamahiriya,* 384 F.Supp.2d 120, 132 (D.D.C. 2005)(some internal citations omitted):

> Section 1606 acts as a "pass through" to substantive causes of actions against private individuals that may exist in federal, state, or international law….Our Court of Appeals has never had the opportunity to explicitly sanction any particular cause of action as a basis of liability for a state that has lost immunity under 1605(a)(7). … However, the Supreme Court makes clear that state law can provide the basis for liability.  When a state is not immune from suit, and "state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances."  *First Nat. City Bank v. Banco Para El Comercio Exterior De Cuba,* 462 U.S.

> 611, 622 n.11, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983); *see*
> *also Brink's Ltd. V. South African Airways,* 93 F.3d 1022,
> 1030-32 (2d Cir. 1996) (noting that "state law generally
> controls in FSIA cases").  Recent opinions of this district
> court hold foreign states liable for terrorist activity on state
> law grounds.

15.    State law provides a basis for liability in this case.  The federal choice of

law rule follows that of the *RESTATEMENT (SECOND) OF CONFLICTS*, which provides that

the law of torts is to apply.  When another jurisdiction however has a stronger interest

and closer connections to the case, it is appropriate to apply that jurisdiction as Law.

*RESTATEMENT (SECOND) OF CONFLICTS* § 175 (1969).  Although the actions complained of

in the instant case took place in North Korea, the United States and the various States in

which Plaintiffs are and were domiciled at the time of the incident (namely California,

Illinois, Virginia and Pennsylvania) have a much stronger interest than North Korea in

adjudicating this action arising from the hostage taking and torture of United States

citizens by North Korea.

**(Torture)**

16.    The torturing of Plaintiffs Massie, Tuck, McClarren and Cdr. Bucher by

officials of North Korea -- directed at coercing them to confess to invading North Korean

territorial waters and being involved with an alleged CIA plot to start a war with North

Korea in order to exact an apology from the United States -- is the kind of harm that the

United States has a state interest in discouraging.  Given the strong United States interest,

in addition to the strong interest of plaintiffs' home states in providing legal relief to their

residents, the laws of Illinois, Virginia, Pennsylvania and California should govern the

tort claims of Plaintiffs Massie, Tuck, McClarren and Cdr. Bucher.

17.     Plaintiffs each allege common law assault, battery, false imprisonment, intentional infliction of emotional distress and loss of solatium.  They also seek money damages for economic damages, loss of solatium, pain and suffering for the acts that are among those described in 28 U.S.C. § 1605(a)(7).  The acts complained of include personal injury that was caused by acts of torture and hostage taking.

18.     Torture is a severe form of battery which, under California law, "is any intentional, unlawful and harmful contact by one person with the person of another." *Ashcraft v. King,* 228 Cal. App. 3d 604, 611 (Cal. Ct. App. 1991). Specifically, the tort of civil battery consists of the following three elements:

        (1) the defendant intentionally did an act that resulted in a harmful or offensive contact with the plaintiff;

        (2) the plaintiff did not consent to the contact;

        (3) the contact caused injury, damage, loss or harm to the plaintiff.  *Id.* All of these elements have been demonstrated and proven in this case.

19.     In *Priest v. Rotary,* 634 F.Supp. 571, 584 (N.D. Cal. 1986), the district court held that "[u]nder California law, when a person is injured by the tortuous acts of another, she is entitled to recover from the tortfeasor an amount that will compensate for all the detriment proximately caused by the tortuous acts."

20.     It is also well established in California that the damages recoverable by the victim of a tortuous act may also include recovery for "the grief, anxiety, worry, mortification, and humiliation which one suffers by reason of physical injuries." *Merrill v. Los Angles Gas & Elec. Co.,* 158 Cal. 499, 512 (Cal. 1910).

21.     An essentially identical cause of action for battery is available under the laws of the Commonwealths of Pennsylvania and Virginia and the State of Illinois. Under federal common law, and supported by state and international law and the common law of torts, Plaintiffs can recover for torture as stated in the complaint.

**(Assault And Battery)**

22.     The named Defendants in this action are responsible for numerous acts of assault and battery upon Plaintiffs during their arrest, imprisonment, and torture.  Under California law and under the laws of the State of Illinois and the Commonwealths of Pennsylvania and Virginia, a civil action for assault is based upon actions or inactions by a defendant that place the person in fear of personal harm. *Kiseskey v. Carpenters' Trust for Southern California,* 144 Cal.App.3d 222, 232 (Cal. Ct. App. 1983) ("[t]he tort of assault is complete when the anticipation of harm occurs" and the tort of civil battery consists of the following three elements, (i) the defendant intentionally did an act that resulted in a harmful or offensive contact with the plaintiff; (ii) the plaintiff did not consent to the contact; (iii) the contact caused injury, damage, loss or harm to the plaintiff) (citing *Ashcraft v. King, supra,* 228 Cal. App.3d at 611).  *See also, Cohen v. Lit Brothers*, 166 Pa. Super. 206, 209 (Pa. Super. Ct. 1950) (Assault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person); *Koffman v. Garnett,* 265 Va. 12, 16 (Va. 2003) (the tort of "battery" is an unwanted touching which is neither consented to, excused, nor justified, whereas the tort of assault consists of an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in that other person's

mind a reasonable apprehension of an imminent battery); *Cohen v. St. Joseph Memorial Hospital, Inc.*, 648 N.E.2d 329, 332 (Ill. App. 5 Dist. 1995) (an actor commits a battery if he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and a harmful contact with the person of the other directly or indirectly results) (quoting RESTATEMENT (SECOND) OF TORTS, § 13 (1965)); *Parrish by Bowker v. Donahue*, 443 N.E.2d 786, 788 (Ill. App. 3 Dist. 1982) (battery is the "willful touching of the person of another or a successful attempt to commit violence on the person of another," whereas assault is the "intentional, unlawful offer of corporal injury by force, or force unlawfully directed, under such circumstances as to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented"). In addition, federal common law takes an essentially identical position. *See* RESTATEMENT (SECOND) OF TORTS §§ 13, 21, and 27.

23.     Plaintiffs are entitled to recover for the severe, multiple and incessant assaults and batteries that were committed by Defendants during the course of eleven months between January 23, 1968 and December 23, 1968.

**(False Imprisonment)**

24.     The named Defendants in this action are responsible for the false imprisonment of Plaintiffs. At the time that the USS Pueblo and the Plaintiffs came under an unprovoked and unlawful attack by military elements of North Korea, they were operating in international waters beyond the boundaries of North Korea. After being forcibly removed from their ship, Plaintiffs were unlawfully detained and held hostage against their will and without their consent for a period of eleven months.

25.     California, Pennsylvania, Illinois and Virginia provide a cause of action

for false imprisonment as alleged in the instant complaint. *Lincoln v. Grazer,* 329 P.2d

928, 930 (Cal. Ct. App. 1958) (a false imprisonment action can still be maintained if "the

defendant unlawfully detains the [plaintiff] for an unreasonable period of time").  *See*

*also, Molko v. Holy Spirit Ass'n,* 762 P.2d 46, 63 (Cal. 1988) (false imprisonment is

defined as the "nonconsensual, intentional confinement of a person, without lawful

privilege, for an appreciable length of time, however short"); *Fagan v. Pittsburgh*

*Terminal Coal Corporation,* 299 Pa. 109 (Pa. 1930) (elements of false imprisonment in

Pennsylvania are the detention of another person and the unlawfulness of such detention);

*Ross v. Mauro Chevrolet*, 861 N.E.2d 313, 317 (Ill. App. 1 Dist. 2006) (must show that

plaintiff was restrained or arrested by the defendants and that the defendants acted

without having reasonable grounds to believe that an offense was committed by the

plaintiff) (quoting *Reynolds v. Menard, Inc.*, 850 N.E.2d 831 (Ill. App. 1 Dist. 2006);

*Russell v. Kinney Contractors, Inc.*, 795 N.E.2d 340, 347 (Ill. App. 5 Dist. 2003) (False

imprisonment requires unreasonable or unlawful restraint of personal liberties against

one's will, caused or procured by the defendant, and that the defendant actually or legally

intended the restraint) (citing *Arthur v. Lutheran General Hospital, Inc*., 692 N.E.2d

1238-1243 (Ill. App. 1 Dist. 1998); *Zayre of Virginia, Inc. v. Gowdy*, 147 S.E.2d 710, 713

(Va. 1966) (False imprisonment is restraint of one's liberty, or the reasonable

apprehension of forced restraint of one's liberty, without any sufficient cause, but does

not require a showing of confinement in jail or placement in the custody of an officer, or

that the defendant acted with malice, ill will or with the slightest wrongful intention)

(citing *Montgomery Ward & Co., v. Wickline*, 50 S.E.2d 387 (Va. 1948)).  Federal

common law and a number of federal statutes (including the Federal Tort Claims Act)

also provide a cause of action for false imprisonment, and § 1606 of the FSIA attaches

liability to a foreign state "in the same manner and to the same extent as a private

individual under like circumstances."

26.    The facts conclusively demonstrate that Plaintiffs were falsely imprisoned

by Defendants, and pursuant to the FSIA, federal common law and state law, this cause

of action can proceed against all Defendants.


### (Intentional Infliction of Emotional Distress)

27.    California law provides a claim for intentional infliction of emotional

distress where a plaintiff can satisfy the following elements: "(1) outrageous conduct by

the defendant, (2) intention to cause or reckless disregard of the probability of causing

emotional distress, (3) severe emotional suffering and (4) actual and proximate causation

of the emotional distress."  *See Agarwal v. Johnson,* 25 Cal.3d 932, 946 (Cal.1979),

overruled on other grounds in *White v. Ultrimar,* 21 Cal.4th 563, 574 n.4 (Cal.1999).

Similar relief is recognized by Illinois and Virginia. *Reilly v. Wyeth*, 876 N.E.2d 740, 755

(Ill. App. 1 Dist., 2007) (must be pled with specificity and allege that the conduct 1) was

truly extreme and outrageous, 2) that the actor either intended that his conduct inflict

severe emotional distress, or knew that there was a high probability that the conduct

would cause severe emotional distress, and 3) that the conduct, in fact, caused severe

emotional distress) (quoting *Welsh v. Commonwealth Edison Co.*, 713 N.E. 2d 679, 684

(Ill. App. 1 Dist., 1999)); *Ogunde v. Prison Health Service, Inc.*, 645 S.E.2d 520, 526

(Va. 2007) (a plaintiff must allege that the wrongdoer's conduct was intentional or

reckless, the conduct was outrageous or intolerable, there was a causal connection

between the wrongdoer's conduct and the resulting emotional distress, and that the

resulting emotional distress was severe) (quoting *Sanchez v. Medicorp Health Systems*,

618 S.E.2d 331, 333 (Va. 2005)).

28.    While Pennsylvania has not expressly recognized a cause of action for

intentional infliction of emotional distress, the courts have cited the RESTATEMENT (2D)

OF TORTS §46(2) as setting for the minimum elements necessary to sustain such a cause

of action. *Taylor v. Albert Einstein Medical Center*, 754 A.2d 650, 652 (Pa. 2000), citing,

*Kazatsky v. King David Memorial Park,* 515 Pa. 183, 527 A.2d 988 (Pa. 1987).

29.    In *Cervantez v. J.C. Penny Co.,* 24 Cal. 3d 579, 593 (Cal. 1979), the court

cited to the Restatement (Second) of Torts §6, Comment d, and held that in order for

defendant's conduct to be considered "outrageous," it "must be so extreme as to exceed

all bounds of that usually tolerated in a civilized community."

30.    Under California law, damages for intentional infliction of emotional

distress may be recovered for both economic losses, which include "[r]easonable

compensation for any financial loss suffered by the plaintiff which was proximately

caused by emotional distress," and non-economic losses such as damages for

"humiliation, anxiety, and mental anguish." *Agarwal v. Johnson, supra,* 25 Cal.3d at 953.

31.    At all times herein relevant Rose Bucher was the lawful spouse of Cdr.

Bucher.  Cdr. Bucher died on January 28, 2004.  During his lifetime, Cdr. Bucher had a

cause of action for the physical injuries and damages he suffered at the hands and feet of

the defendants, as well as mental injuries inflicted through other outrageous conduct such

as the threats to kill the crew and forcing him to view the body of a human being who had

been brutally and savagely tortured in order to exact a confession from him.  Such causes of action survive pursuant to state law and are brought by the Plaintiff, Rose Bucher, the Personal Representative of the Estate of Lloyd Bucher, Deceased.  Moreover, the outrageous tortuous conduct of North Korea proximately caused all other Plaintiffs to experience severe emotional distress, literally, terror.  In addition, the intentional conduct of the defendants caused Mrs. Bucher, herself, severe emotional distress in not knowing the fate of her husband and fearing the worst.  Subsequently, she lived with a man haunted by his tortures, the torture of his crew, the humiliation of surrendering his ship and the subsequent loss of his promising career.

### (Loss Of Solatium)

32.    Cdr.Bucher was a member of the crew of the USS Pueblo at the time of its unlawful capture by North Korea.  At all times herein relevant Rose Bucher was the lawful spouse of Cdr. Bucher.  The tortuous conduct of North Korea proximately caused Rose Bucher to lose and be deprived of the services, support, consortium, affection, companionship, and solatium of and with her husband, Lloyd Bucher.

33.    This Court has recognized the cause of action for loss of solatium under the federal common law by relying upon the SECOND RESTATEMENT OF TORTS § 46 (1986) ("one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress. … All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience." *Stethem v. Islamic Republic of Iran,* 201 F. Supp. 2d 78, 89 (D.D.C 2002).

**Damages**

34.    The terrorist acts of the Defendants were intentional, malicious, and performed deliberately to physically and mentally injure, damage, and harm the crew members of the USS Pueblo and Rose Bucher such that the Defendants should be subjected to damages to punish said Defendants and to deter them and others from committing such acts in the future.

35.    As a result of North Korea's outrageous conduct, Plaintiffs were subjected to both mental and physical torture by North Korea throughout their incarceration, the effects of which have been felt by Plaintiffs for the last thirty-nine years and will be felt by Plaintiffs for the rest of their lives, which have likely been shorted by the defendants' egregious, unlawful conduct.  Because section 1606 of the FSIA provides that a "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 1606, plaintiffs are entitled to the typical array of compensatory damages that may be awarded against tortfeasors in California, Virginia, Illinois and Pennsylvania, including, for example, and without limitation, pain and suffering and lost past and future wages.

**(Pain and Suffering During Captivity)**

36.    The evidence of Plaintiffs' pain and suffering, both physical and mental, over the eleven months of captivity is extensive and shocking.  Although the Courts have found that putting a number on these kinds of harms can be difficult, precedence guides the calculations.  In many cases of prolonged and abusive captivity, such as the case herein, Plaintiffs are awarded approximately $10,000 per day for the pain and suffering

they experienced while captive.  *See, e.g., Price v. Socialist People's Libyan Arab JamahiriYa, supra,* 384 F.Supp.2d at 134.

37.     Plaintiffs ask the Court to follow the per diem approach of this Court in *Price v. Socialist People's Libyan Arab JamahiriYa, supra,* 384 F.Supp.2d at 135; and *Sutherland v. Islamic Republic of Iran,* 151 F.Supp.2d 27, 51 (D.D.C. 2001).  In those cases, the Court awarded $10,000 per day for the pain and suffering they experienced while captive.  Here, the treatment and the horrors that were endured by Plaintiffs Massie, Tuck, McClarren and Cdr. Bucher were even more severe and long-lived such that the Court concludes that each Plaintiff in this case is entitled to at least $10,000 per day, for a total of at least $3,350,000 for the pain and suffering they endured throughout their 335 days of captivity.

### (Pain and Suffering After Captivity)

38.     As was also recognized in *Price,* "[i]n some cases the per diem amount will adequately compensate plaintiffs for pain and suffering both during and after captivity."  As was the case in *Price,* "this is not one of those cases."  In this case, plaintiffs suffered physical and mental harm that has endured for the past 39 years and will likely continue to endure throughout the rest of their lives.  Not only do plaintiffs continue to suffer physical disabilities, including post traumatic stress disorder, but they have had continued difficulty in daily living, in social interactions, and in employment.

39.     A $3,350,000 pain and suffering award is lower than numerous other such awards in similar cases and does not fully compensate plaintiffs.  In *Price,* the court was faced with awarding damages to two American citizens who were incarcerated by the

Libyan government for 105 days.  During the time they were incarcerated, they were

mentally and physically tortured by agents of the Libyan government acting in their

official capacities.  As was the case herein, the torture inflicted was systematic and

severe.  Moreover, it was directed at forcing the captives to confess that they were acting

as spies for the United States.  As was also the case herein, the harm caused to the

captives years before they filed their complaint was permanent and debilitating.

      40.    Adopting the reasoning expressed by the court in *Acree v. Republic of*

*Iraq*, 271 F.Supp.2d 179 (D.D.C. 2003),[1] which involved U.S. soldiers who had been

captured and tortured during the Gulf War of 1991, Judge Lamberth recognized that the

physical and mental harm the captives had endured for many years after their release,

which included physical disabilities, as well as continued difficulty in daily living, in

social interactions, and in employment, should be compensated.  He therefore awarded

plaintiffs a lump sum for pain and suffering felt after captivity.  As readily demonstrated

by the court's discussion, the lasting harms are virtually identical in all cases:

> Each [plaintiff] has had to learn to deal with a life
> shattering experience.  Some have undergone recurrent
> painful medical procedures to seek to undo the physical
> injury done by the [North Korean] torturers.  Some have
> seen their marriages and family lives disrupted.  Others
> have suffered in their professional lives.  All have been
> profoundly affected and may continue to suffer for the rest
> of their lives….[They] continue to suffer from lingering
> effects of the injuries and medical problems incurred during
> captivity … and many of these will persist throughout the
> lifetime of the patients affected.

*Price*, 384 F.Supp. 2d at 135-36 (*quoting Acree*, 271 F.Supp.2d at 220-21).

---

[1] The district court's decision was ultimately vacated on other grounds following enactment of the Emergency Wartime Supplemental Appropriations Act, Pub. L. No. 108-11, § 1503, 117 Stat. 559, 579 (2003), *see Acree v. Republic of Iraq*, 370 F.3d 41 (D.C.Cir. 2004), *cert. denied*, 544 U.S. 1010 (2005).

41.     The *Price* and *Acree* courts also recognized the particularly severe

emotional harm that certain of the POWs suffered as a result of their captivity.  *See Price,*

*id.* (describing the severe emotional harm suffered by POW, Clifford Acree):

> In 1992, he was diagnosed with Post-Traumatic Stress
> Disorder ("PTSD") arising from his mistreatment in Iraq.
> In 1998, while on assignment to NATO, he suffered what
> was diagnosed as a Major Depressive Episode coincident
> with a recurrence of PTSD.  He returned to the United
> States, where he was placed on medical leave during seven
> months of psychiatric treatment.  He still suffers a number
> of problems caused by his captivity, including rapid and
> irregular heartbeat, low back pain, night sweats, headaches,
> nervousness when stressed, irritability when tired,
> numbness and tingling in his upper extremities, and some
> hearing loss and tinnitus.

*Id.* at 187.

42.     The effects suffered by Price, Frey, Acree and many of their fellow POWs

are virtually identical to the effects that Plaintiffs Massie, Tuck, McClarren and Cdr.

Bucher endured and will likely endure.  Because they were held in captivity and

subjected to severe beatings for more than three times as long as the earlier hostages, the

Court will award each Plaintiff $21,000,000 in damages for pain and suffering felt after

captivity.  This award brings each Plaintiff's total pain and suffering award to

$24,350,000, a figure that, to the Court, sufficiently reflects Plaintiffs' total pain and

suffering.

The Court also awards reasonable attorneys' fees and costs of suit, according to

offered proof.

Signed:

Henry H. Kennedy, Jr.
United States District Judge
Dated:_____