**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

**WILLIAM THOMAS MASSIE, et al.,**

**Plaintiffs,**

**v.**

**THE GOVERNMENT OF THE DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA,**
**Defendant.**

</td><td>

Civil Action 06-00749 (HHK)

</td></tr>
</table>

**MEMORANDUM**

This action is brought pursuant to the "terrorism exception" of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(7) ("FSIA"), and arises from the kidnaping, imprisonment and torture of United States citizens who were aboard the USS Pueblo ("Pueblo") when the vessel was captured by agents of the Government of the Democratic People's Republic of Korea ("North Korea") in January 1968. Plaintiffs are William Thomas Massie and Donald Raymond McClarren, members of the Pueblo's crew, Rose Bucher, the widow of Lloyd Bucher ("Cdr. Bucher"), the Pueblo's commander, and the representative of his estate, who sues on her own behalf as well, and Dunnie Richard Tuck, who worked aboard the Pueblo as a civilian oceanographer conducting oceanographic surveys.

North Korea was properly served with a summons and copy of the complaint on September 8, 2006. Because North Korea did not answer or otherwise respond to the complaint, this court entered a default. On April 21 and April 22, 2008, this court held a damages trial. Based upon the evidence presented at the damages trial, the court makes the following:

# I.  FINDINGS OF FACT

## A.      Introduction and Background

1.      On January 23, 1968, the Pueblo, which was engaged in electronic surveillance and other activities, sat dead in international waters in the Sea of Japan, approximately 25 miles from Wonson, North Korea, and 15.6 miles from the nearest land, North Korea's Ung-Do island. *See* Pls.' Trial Ex. 15 ("Ex. 15") at 121, ¶ 211; Tr. of Damages Hr'g ("Tr.") 11-15, April 22, 2008.

2.      The vessel had no armor protection and was lightly armed with two .50 caliber machine guns, ten Browning semi-automatic rifles and a handful of .45 caliber handguns. *See* Ex. 15 at 113-114.

3.      The Pueblo was manned by a crew of 83, which consisted of U.S. Navy personnel, including plaintiffs Massie, McClarren, and Cdr. Bucher, National Security Agency personnel, and two civilian oceanographers. *See* Tr. 16-17, April 22, 2008; Tr. 44, April 21, 2008.

4.      About noon on January 23, 1968, the Pueblo was approached by a North Korean SO-1 class sub-chaser, hull number 35 ("SC-35").  SC-35 was at general quarters and its deck guns – a 3-inch cannon and two 57 mm gun mounts – were manned and trained on the Pueblo. *See* Ex. 15 at 122.

5.      At 12:12, SC-35 signaled "What nationality."  In response, Cdr. Bucher ordered the ensign to raise the flag indicating that the Pueblo was engaged in hydrographic research.  *See* Ex. 15 at 122, ¶¶ 228-29; Tr. 15-16, April 21, 2008.

6.      At 12:20, three North Korean P-4 motor torpedo boats were seen approaching the Pueblo from the direction of Wonson, North Korea.  *See* Ex. 15 at 123, ¶ 232.

7.      Then, at 12:27, on its third swing around the Pueblo, SC-35 hoisted a new signal: "Heave to or I will open fire on you." The Pueblo, after confirming its location, signaled that "I am in international waters." Ex. 15 at 123, ¶¶ 233-34.

8.      By 12:35, the torpedo boats arrived and took positions around the Pueblo while two snub-nosed MiG-21s began a menacing circling of the Pueblo. *See* Ex. 15 at 123, ¶¶ 240-243; Tr. 16, April 21, 2008.

9.      Shortly thereafter, new flags were hoisted on one of the torpedo boats: "Follow in my wake. I have pilot aboard." Ex. 15 at 124, ¶ 246. Then a boarding party transferred from the SC-35 to one of the torpedo boats, PT-604, which began backing toward the Pueblo's starboard bow with fenders rigged. Men in helmets with rifles and fixed bayonets stood on PT-604's deck. The signal was repeated: "Heave to or I will open fire." *Id*. at ¶ 247.

10.      In response, Cdr. Bucher hoisted the signal: "Thank you for your consideration. I am departing the area." *Id*. at ¶ 249.

11.      Cdr. Bucher then gave the order to get under way at one-third speed. As the Pueblo began moving, the torpedo boats began crisscrossing the ship's bow and SC-35 again signaled, "Heave to or I will fire." *Id*. at ¶¶ 252, 254.

12.      After Cdr. Bucher ordered the speed of the Pueblo increased to full speed, SC-35 gave chase while sailors aboard one of the other torpedo boats, PT-601, uncovered a torpedo tube and trained it on the Pueblo. *Id*. at ¶ 257.

13.      At this point, SC-35 directed all North Korean vessels to clear the area and announced that it was going to open fire on the Pueblo because it would not comply with North Korean navy instructions. Seconds later, SC-35 commenced firing its 57mm guns and the

torpedo boats began firing their 30mm guns.  No attempt was made to man the Pueblo's 50mm guns in order to return fire.  Although most of the heavy machine gun rounds were aimed over the Pueblo, its signal mast was struck and Cdr. Bucher collapsed with small shrapnel wounds in his ankle and rectum.  Ex. 15 at 125, ¶¶ 260-266.

14.     Recognizing that there was no escape, Cdr. Bucher, at 1:34, gave the command "All stop" and the signalman was ordered to hoist the international signal for "Protest."  The 57mm fire halted but the 30mm fire continued sporadically.  Ex. 15 at 126, ¶ 278.

15.     After the Pueblo briefly resumed movement, Cdr. Bucher, at about 2:30, once again ordered another "All Stop."  Almost immediately, SC-35 closed to a range of about 2,000 yards and fired.  This round of firing caused the death of a Pueblo crew member, Fireman Duane Hodges.  Ex. 15 at 127, ¶ 294; Tr. 19, April 21, 2008.  As many as 2,000 rounds struck the Pueblo.  Ex. 15 at 144, ¶ 426.

16.     At 2:32, a group of two North Korean officers and eight to ten enlisted men armed with AK47 assault rifles boarded the Pueblo.  *See* Ex. 15 at 129-30, ¶¶ 320, 323.

17.     They forcibly gathered members of the Pueblo crew on the well deck of the Pueblo, where the temperature was below freezing, and forced them to sit blindfolded with their hands and ankles tightly bound.  *See* Tr. 20-21, 72, April 21, 2008; Tr. 25-27, April 22, 2008.

18.     If crew members resisted, the North Koreans punched, kicked or jabbed them with their weapons.  *See* Tr. 27, April 22, 2008.

19.     After some time had passed, the crew members were pulled to their feet and taken inside of the Pueblo where Massie, along with the other crew members, were forced to sit on the floor in several inches of icy sea water.  *See* Tr. 73-74, April 21, 2008.

20.     At about 4:00, a second boarding party arrived with a senior North Korean colonel and a civilian pilot, who relieved the Pueblo's helmsman. Following an inspection of the ship by the North Koreans accompanied by Cdr. Bucher, Cdr. Bucher was ordered to sit on the deck outside his cabin. *See* Ex. 15 at 131, ¶ 343.

21.     At approximately 8:30 p.m. on January 23, 1968, the Pueblo was tied up at a pier about ten miles northwest of Wonson and Cdr. Bucher was interrogated by several high-ranking North Korean officers. *See* Ex. 15 at 132, ¶ 359.

22.     When the interrogation was finished, the crew was dragged off of the ship and, while bound and blind-folded, forced to walk over a thin gangplank approximately 8 to 10 inches wide onto North Korean soil. *See* Tr. 22, 75-75 April 21, 2008; Tr. 30, April 22, 2008. They were then led in front of an unruly crowd who yelled insults and spat at them. The guards also kicked them in the legs and administered "karate chops." *See* Ex. 15 at 146, ¶ 434; Tr. 75-76, April 21, 2008.

23.     The crew was taken from the Wonson pier to a small building where they were beaten and severely mistreated in an effort to have them say that they were South Korean spies. *See* Ex. 15 at 147, ¶ 436.

24.     At this small building, Massie, who was still blindfolded, was shoved into an iron stove. When he tried to cover his face from the heat and flames, Massie sustained burns to his hands. *See* Tr. 76, April 21, 2008.

25.     While still blindfolded, the crew was forcibly put into buses with covered windows and was driven to a train station. On the way to the train station, the buses stopped at several places where North Korean civilians came aboard to beat and yell at the crew. North Korean officials also beat the crew with rifle butts and fists and kicked them. *See* Tr. 31, 33, April 22, 2008; Tr. 23, 77, April 21, 2008.

26.     When they arrived at the train station, the captives were pulled from the buses. They remained blindfolded while being kicked and beaten in front of another hostile crowd

before being loaded onto a train that would transport them to Pyongyang, where they would be held for six weeks. *See* Tr. 31, April 22, 2008; Tr. 23, April 21, 2008.

27.     While on the train en route to the first detention site, the crew was continually mistreated, kicked, prodded with rifle butts, slapped, and punched by guards. *See* Tr. 24, 77, April 21, 2008; Tr. 33, April 22, 2008.

28.     Several interrogations were conducted while in transit on the train and accusations of espionage were made by the captors. *See* Ex. 15 at 147, ¶ 437; Tr. 24, April 21, 2008.

29.     During the 10 hour train ride, civilians on the train were allowed to beat, spit, and otherwise humiliate the captives, who remained blindfolded and bound. *See* Tr. 33-34, April 22, 2008. Cdr. Bucher was questioned six or seven times, and was hit on the back of his head with a rifle butt when he provided an unacceptable answer.   He requested that the Pueblo's crew be treated in accordance with the precepts of the Geneva Convention, but his requests were ignored. He was told by the captors that the Geneva Convention did not apply because the crew was held as civilian prisoners in violation of North Korean criminal espionage laws. *See* Ex. 15 at 147, ¶ 438.

30.     Upon arriving in Pyongyang the captives had their hands untied and the blindfolds removed.  At the train station, Cdr. Bucher and the officers were marched off first with their hands held up, followed by the remaining crew members, an event that was heavily covered by the North Korean press. *See* Tr. 28, 77, April 21, 2008; Tr. 35, April 22, 2008.

31.     The captives were then placed on a bus.  As had been the case with the train, the bus windows were covered so that it was impossible for the captives to see where they were being taken or otherwise know their fate. *See* Tr. 29, April 21, 2008; Tr. 35, April 22, 2008.

32.     The captives were transported to a "prison" building on the outskirts of town, which the crew nicknamed the "Barn," where they were held hostage for the next six weeks. When the buses arrived at the Barn in the early morning hours of January 24th, the captives were

separated into rooms as they filed into the building.  The heating system was off despite the

severe winter cold.  Bare light bulbs provided constant illumination and deprived the prisoners of

sleep. The windows were covered depriving the prisoners of any situational awareness, and the

hallways were dim.  The atmosphere was one of severe cold, pierced by yelling, stomping,

pounding and screaming.  There was no running water.  *See* Ex. 15 at 150, ¶ 452; Tr. 30, 99-100,

April 21, 2008.

33.     The crew was held in rooms with four men to a room.  Each room had four cots, a

table and four chairs.  *See* Tr. 36-37, April 22, 2008; Tr. 29-30, 77, April 21, 2008.  During the

day, the captives had to sit at painful attention with their fists clenched down to their sides and

their shoulders thrown back as far as possible.  Their necks were shoved down as far as they

could hold them. If the guards did not think that the heads were not being held down far enough,

the guards would push the heads down to the point where the captives had difficulty breathing.

*See* Tr. 99, April 21, 2008.

34.     Rats were in the hallways and in the bathroom.  *See id*.  As a result of bed bug

bites, Massie developed a severe infection that caused his leg to become inflamed and swollen.

After the leg had swollen to twice its normal size, a North Korean doctor, without the use of an

anesthetic, sliced it open with a pocket knife in order to drain the infection and swab the opened

area of the leg with some type of medicine.  Because Massie was unable to control the movement

of his leg, one of his captors sat on his stomach while two others held his legs down on the table

on which he had been placed.  *See id*. at 101-103.

35.     During the six weeks they were detained at the Barn, the hostages were

continuously tortured and beaten and were not allowed to speak to one another.  *See* Tr. 37-38,

April 22, 2008.  If one hostage was caught talking to another captive, both would be beaten into unconsciousness.  *See* Tr. 99-100, April 21, 2008.

36.      The hostages were not allowed to leave the building for any reason.  However, on one occasion, Cdr. Bucher was taken to view the tortured body of a person he was told was a South Korean spy and who, according to North Korean officials, did not cooperate.  *See* Ex. 15 at 150, ¶ 452.

37.      The harsh treatment of the crew and Tuck during the eleven months they were held hostage consisted of severe physical beatings with karate blows, broom handles, belt buckles, boards and chairs, along with punches with rifle butts and whatever else that was handy.  *See* Tr. 103, April 21, 2008; Tr. 81, April 22, 2008.  A common and extremely painful torture was to force a captive to hold a chair above his head while kneeling or squatting with a board or stick behind his knees.  *See* 15 at 150, ¶ 457.  The beatings were accompanied by intimidation and threats that the crew members would be shot as spies if they did not confess.  These threats created a constant fear of execution.  *See id.*; Tr. 44-51, April 22, 2008.

38.      On one occasion after McClarren was taken out of his room for interrogation, he was forced to kneel, a two-by-four was placed between his knees, and he was forced to lay on his back.  After several hours, the guards told him to get up on a chair.  Because he could not walk, he was forced to crawl to the chair and climb onto it.  As he sat there, the officer that was behind the chair pulled out a gun, put it to McClarren's head, and pulled the trigger.  When the trigger merely clicked, McClarren lost consciousness.  *See* Tr. 35, April 21, 2008.

39.     Another form of torture involved requiring the captives to stand against the wall with their arms held out straight.  When their arms started to fall, the guards would hit them.  When they could no longer put their arms up, the guards would beat them.  *See id.* at 38.

40.     When he was interrogated a day or two after arriving at the barn, Tuck was told that he would be shot because he was an FBI spy and not protected by the Geneva Convention.  *See* Tr. 41-42, April 22, 2008.  He was then asked what he thought.  In response, Tuck pulled out a dime and told the interrogators that if they would take him to Panmunjom and let him call President Johnson, the situation could be straightened out.  *Id.* at 44.  At that point, one of the North Korean officers jumped over the table at which he was seated, grabbed a rifle from the guard who was standing next to Tuck, and hit Tuck with it on Tuck's chin.  The blow split Tuck's chin open.  See *id.* at 44-45.

41.     When the captives were allowed to go to the toilet to relieve themselves, the guards routinely administered karate kicks to them on their way to and from the toilet.  *See* Tr. 36-38, 114-15, April 21, 2008; Tr. 46, April 22, 2008.

42.     It is apparent that the captives were treated as they were because their captors wanted to extract confessions from them that  they were spying on North Korea in North Korean waters, and not international waters, when the Pueblo was hijacked.  *See id*. at 38.

43.     For 40 days, the captives  were not given an opportunity to shower, change clothes or shave.  They were covered in their own blood and in some cases their own feces.  *See* Tr. 30, 100, April 21, 2008.

44.     The food provided to the captives was very poor in quantity and quality and lacked proper vitamin and nutritional content.  In caloric content it was marginally able to sustain

life (about 500 calories per day).  Rice, bits of fish, turnip soup, bread and butter accounted for the bulk of the diet.  Meals were served in buckets in a most unsanitary manner.  *See* Pls.' Trial Ex. 11 ("Ex. 11"), at 5-6; Ex. 15 at 150, ¶ 453; Tr. 98-99, April 21, 2008; Tr. 70, April 22, 2008. During the eleven months they were held hostage, Cdr. Bucher lost approximately 50 pounds. *See* Tr. 118, April 22, 2008.  Massie lost 51 pounds.  *See* Tr. 99, April 21, 2008.  Tuck lost 37 pounds.  *See* Tr. 90, April 22, 2008.

45.     Immediately after Cdr. Bucher arrived at the Barn on the morning of January 24, he underwent interrogations during which he and his crew were accused of being spies.  He was told that he and his crew would be treated as civilian espionage agents, tried under Korean law and shot at sundown.  In almost every interview, his captors demanded that he sign a typed confession that he was a spy and a member of the Central Intelligence Agency ("CIA") and was trying to start a war.  Cdr. Bucher refused to sign.  *See* Ex. 15 at 148, ¶¶ 440-41.

46.     About noon, Cdr. Bucher had his first direct interview with the officer who would be in charge of the captives throughout their confinement.  This officer, nicknamed "Super C" because he was a senior colonel (later renamed "GG" for "Glorious General" after he was promoted), was considered to be highly intelligent, competent, but cruel.  At one stage in the interrogations, Cdr. Bucher was confronted with classified publications removed from the ship, including his own narrative log. *See id.* at ¶ 441.

47.     At about 8:00 p.m. of the first day at the Barn, Cdr. Bucher was again taken to an interrogation room.  Present were "Super C," another officer with a drawn pistol, a third officer, two or three enlisted men with bayonets fixed to their guns, and several interpreters.  Again, Cdr. Bucher was told to sign the typed confession.  When he refused, he was told to sign or he would

be shot.  *Id*.  He was then made to kneel on the floor, while an officer with a drawn pistol stood

behind him and another officer stood in front.  While kneeling on the floor, he repeated the

phrase "I love you, Rose" over and over to keep his mind off of what was to come.  Tr. 110,

April 22, 2008.  At the end of two minutes, the officer in front of him was ordered to move aside

and "Super C" said "Kill the son-of-a-bitch."  Although the trigger was pulled, the gun did not

discharge.  *See id.*

48.     At about 10:30 p.m. on January 24, Cdr. Bucher, having not eaten or slept for a

day and a half, was returned to the same interrogation room and told that he would now see what

happened to spies.  He was led to a staff car and driven to a building about ten minutes away.

There he was shown a man, allegedly a South Korean, who was strapped to the wall and had

undergone extreme physical torture.  The man's head was badly swollen, one eye hung out of its

socket and broken bones were evident.  Cdr. Bucher was told "Now you know what happens to

spies."  *See* Ex. 15 at 148, ¶ 441; Tr. 39, April 22, 2008.

49.     About 45 minutes later, Cdr. Bucher was taken again to an interrogation room.

During this session he was informed that his crew would be shot, in his presence, one by one,

beginning with the youngest crew member.  Cdr. Bucher was also told that after every crew

member had been killed, he finally would be made to sign a confession and that he too would

then be killed.  He was told that his interrogators had already sent for Engineman Fireman

Howard E. Bland.  When Bland was brought into the room, Cdr. Bucher was convinced that his

captors would carry out their threat and therefore signed the confession.  *See* Ex. 15 at 148, ¶

441;Tr. 40-41, April 22, 2008.

50.     It is apparent that North Korea was primarily interested in obtaining confessions and personal history statements from the captives for international propaganda purposes.  *See* Ex. 15 at 155, ¶ 490.  Immediately upon arrival at the Barn, North Korean agents began their unrelenting assault on the crew to get them to admit to crimes.  Men were taken, in what seemed to be a random order, and interrogated about their jobs on the Pueblo, and why the Pueblo had intruded into its territorial waters and spied on North Korea.  *See* Tr. 50-51, April 22, 2008.  Because the captors had the ship's personnel file, they knew the answers.

51.     Each man was told that he must admit his crimes if he hoped to live and someday see his family again.  During the first few weeks of detention the captives endured individual threats of death, threats to kill others, severe beatings, torture, both physical and mental, and other means of coercion.  *See* Ex. 15 at 150, ¶ 456; *Id*. at 155, ¶ 493.

52.     Massie was kicked repeatedly in the groin as well as in the knees and ankles.

53.     Ultimately, the crew of the Pueblo gave false confessions of guilt for operating a "spy"ship in North Korean territorial waters and espionage.  *See* Ex. 15 at 155, ¶ 495.

54.     On March 4, 1968, the hostages were moved to a site outside the city that they designated the "Farm."  This facility was located on the outskirts of Pyongyang.  *See* Tr., p. 55, April 22, 2008; Ex. 15 at 151, ¶ 459.

55.     Upon arriving at the second compound, the hostages were grouped in rooms of eight men, except for one room of four.  Officers were placed in their own rooms.  This period of detention lasted 42 weeks until December 23, 1968.  *See* Ex. 15 at 151, ¶ 460.

56.     Although the living conditions were better than before, the hostages were provided inadequate rations of food and forced to live in unsanitary conditions.  Personal hygiene

was largely ignored. About every 6 weeks, each room's residents were marched to the bathroom and given one basin of hot water with which to bathe. Each man's clothes consisted of the suit that was given to him before being moved to the compound. However, no means were provided to wash the clothing. *See* Tr. 33, April 21, 2008.

57.     Throughout their time at the Farm until late November, indiscriminate beatings continued. The officers and selected individuals were singled out for periodic torture to exert control over the captives and to coerce additional confessions. *See* Ex. 15 at 155, ¶ 493; Tr. 34-35, April 21, 2008; Tr. 55-56, April 22, 2008.

58.     In addition to the beatings and torture administered during interrogations, rough treatment was the rule, and severe punishment resulted from infractions of confinement regulations. While most of the severe beatings were under the direct orders of officers, there were occasions when enlisted North Korean men would initiate beatings without the knowledge of officers. *See* Ex. 15 at 155, ¶ 496.

59.     The North Koreans used extreme mental pressures to enforce the rules, such as the "no talking" rule. While marching back to his room, Massie asked the Pueblo's Operations Officer whether he had heard any news. This was overheard by the guards. After Massie entered his room, he was confronted by a particularly large guard known as the Bear, who began screaming at Massie while pointing his AK-47 at Massie's head. He then indicated that Massie was to open his mouth. When Massie complied, the Bear stuck his AK-47 into Massie's mouth, ejected his clip and flipped out a bullet to show that it was loaded. He reinserted the clip and then put his finger into the trigger guard while he continued to scream at Massie. Finally, he

13

pulled the gun out of Massie's mouth and hit Massie with it causing Massie to fall over a bunk and onto the floor. *See* Tr. 81, April 21, 2008..

60. On another occasion, Massie was beaten unconscious because he refused to sign a document that the North Koreans wanted to send to his family. The beatings, which included Massie being kicked in the stomach, back and groin, were followed by the threat that he would be shot. *See id*. at 82.

61. Throughout the time the crew was held hostage, North Korea engaged in a prolonged effort to extract a public apology from the United States Government for the Pueblo's alleged intrusion into North Korea's territorial waters and for spying on North Korea. As part of this effort, the hostages were forced to participate in staged press conferences held on August 13 and September 12, 1968. *See* Tr. 56, April 22, 2008.; Ex. 15 at 155, ¶ 490.

62. The latter press conference was an international press conference. At both sessions, the Pueblo's crew inserted innuendos and archaic and corny language into their prepared statements to discredit the propaganda. *See* Tr. 57-58, April 22, 2008.

63. In addition, the North Koreans pressured the hostages to write false letters home to family, friends, and members of Congress reporting that they were receiving humane treatment and asking that the United States apologize for the spying and intrusions into North Korean waters. *See* Ex. 15 at 153, ¶ 477; *Id*. at 157, ¶¶ 506-509. Hostages who resisted were severely beaten until they complied. *See* Ex. 15 at 157, ¶ 506.

64. The Pueblo's crew also was subjected to North Korean propaganda films. In June 1968, two short subjects were shown in which it became apparent that the North Koreans did not know what the middle finger gesture meant. This knowledge became an integral part of the

crew's anti-propaganda campaign, which caused the crew to feel that they had achieved a victory, albeit a small one, by spoiling the North Korean's propaganda by humiliating them on a world stage. *See* Tr. 42, 106-07, April 21, 2008.

65. When asked what the finger meant, the crew deceived the North Koreans by explaining that it was the "Hawaiian Good Luck Sign." This would later result in two weeks of severe beatings and torture of every hostage in early December. *See* Tr. 58, April 22, 2008.

66. The October 18 issue of *Time Magazine* exposed the true meaning of the "Hawaiian Good Luck Sign." In late November or early December, the North Korean captors learned that the middle finger gesture, which had been shown in many pictures and videos, was an obscene gesture. *See* Tr. 107, April 21, 2008; Tr. 58, April 22, 2008.

67. When they learned that they had been discredited by the displaying of an obscene gesture in their propaganda photographs, the North Korean captors were enraged. Commencing in early December, they began a campaign of beatings, harassment, and interrogations so intense and concentrated that the hostages referred to it as "Hell Week." Ex. 15 at 156, ¶ 502. Hell Week actually lasted about two weeks. *See* Ex. 15 at 156, ¶ 502; Tr. 108-112, April 21, 2008.

68. During Hell Week, the hostages were forced into rooms of 16 men per room. *See* Tr. 108, April 22, 2008; Tr. 58, April 22, 2008. They were subjected to cold temperatures, open doors, constant surveillance, lights on at night, sleep deprivation, and a more rigid enforcement of all rules. They were required to sit in a chair at all times with their heads bowed unless they had specific permission to do otherwise. *See* Ex. 15 at 156, ¶ 503.

69. The hostages were subjected to even more mental anguish as they thought they were going to be killed because they had served their purpose as propaganda puppets. Because

of the crowded conditions, they would bump into each other's beds, which further aggravated the mental state of the hostages and prevented them from sleeping. *See* Tr. 59-60, April 22, 2008.

70. The hostages were savagely beaten by their captors for several hours at a time during the two weeks of Hell Week and were subjected to other harsh treatment to get them to disclose the identity of the instigators of the Hawaiian Good Luck Sign deception. *See* Ex. 15 at 156, ¶¶ 503-04; Tr. 108-112, April 21, 2008.

71. During Hell Week, the guards repeatedly jumped on Tuck's back after he was forced to the floor. He was also forced to hold up a chair while the guards beat him in the stomach and back. When he dropped the chair, the guards beat him with it until it broke. They then used broomsticks as a substitute. The beatings ranged from karate chops to rifle butts to kicks to the groin. *See* Tr. 58-59, April 22, 2008.

72. Like most other hostages, Massie was dragged out of his room and beaten with weapons ranging from belts, boards, boots and buckles. He had his arms pulled back and a two-by-four placed though them. He was then beaten in the stomach and kicked on his shoulders and arms. He also had to hold a chair over his head until he couldn't hold it any more. Then he was kicked. *See* Tr. 109, April 21, 2008. The hostages were beaten so badly that the torture rooms were covered in blood. Each succeeding hostage was forced to clean up the blood of the preceding hostage before having their own blood spread over the walls and floor for the next hostage to clean up. *See id*. at 108.

73. The beatings came to an abrupt halt in mid-December. On December 19, Glorious General met with the hostages and restored their basic privileges. The hostages were given one more opportunity to repent, be sincere, and write a new confession. Wounds were

treated and the hostages were given hard boiled eggs to roll on their bloodshot eyes to break up the clots caused by the beatings. Because of his extreme hunger, Tuck ate his egg. Tr. 62, April 22, 2008. On December 22, Glorious General advised the hostages that the United States was apologizing. *See* Tr. 113, April 21, 2008; Tr. 61-62, April 22, 2008.

74.     Shortly thereafter, a new set of clothes was distributed to the hostages. *See* Tr. 118, April 21, 2008; Tr. 62, April 22, 2008.

75.     This was followed by a night train ride to Kaesong, and then by bus to the border at Panmunjom and final repatriation at noon on December 23, 1968. *See* Ex. 15 at 154, ¶ 481; Tr. 67, April 22, 2008.

76.     At Panmunjom, the hostages crossed the "Bridge of No Return" in single-file order with Cdr. Bucher verifying each man's identity as he crossed. He also verified the body of the crew member who was killed on the Pueblo during its capture in January 1968. *See* Tr. 65, April 22, 2008. The hostages were threatened one last time. They were told that if they said or did anything as they crossed the bridge, the remaining men waiting to cross would be shot. *See* Tr. 113, April 21, 2008. Lending credence to this threat, the men were warned to maintain 15-yard gaps between each other and walk at a constant pace. The crew crossed the bridge in order of rank, from lowest to highest, except for Cdr. Bucher who crossed first. *See* Ex. 15 at 154, ¶ 482; Tr. 113; Tr. 68-69, April 22, 2008.

77.     After crossing the bridge, the men were greeted by U.S. Military personnel. *See* Tr. 70, April 22, 2008.

**B.** **Injuries Suffered by the Individual Plaintiffs**

**William Thomas Massie**

1.      Massie is a United States citizen and a domiciliary of the State of Illinois.  At the time he was taken hostage on January 23, 1968, he was 20 years old and held the rank of a Machinist Mate 3rd Class.  *See* Tr. 65-66, April 21, 2008.

2.      During the eleven months he was held hostage, Massie was beaten and tortured and subjected to constant mental and psychological terror on a daily basis.  *See* Tr. 80-89, April 21, 2008.

3.      As a result of being kicked in the stomach, back, ankles, and knees, Massie sustained severe and permanent physical injuries, including herniated disks, pain in the legs, arms and back, ringing in the ear and impotency.  Massie continues to suffer constant pain in his legs, arms and back.  As a result of being repeatedly kicked in the groin, Massie was rendered impotent.  His impotency significantly contributed to a failed marriage, multiple failed relationships, and is an ongoing source of humiliation.  *See* Tr. 81-85, April 21, 2008.

4.      Massie suffers from Post Traumatic Stress Disorder ("PTSD'), disability, and disfigurement as a result of the injuries he suffered while being held hostage.  Although he suffers from numerous disabilities stemming from his captivity, he has been rated at one hundred percent disability for PTSD alone, with lesser percentages for other disabilities related to his captivity that do not serve to increase his disability rating.  *See* Tr. 86, April 21, 2008; Pls.' Trial Exs. 7-9 ("Exs. 7-9").

5.      Massie has suffered lost wages and diminished earning potential.  He has also incurred substantial medical expenses on account of his injuries.  At present, he takes a

substantial number of prescribed medications to ease the pain. *See* Tr. 93-94, April 21, 2008; Pls.' Trial Ex. 10 ("Ex. 10"). Massie consistently has nightmares, cold sweats at night, cannot tolerate people walking behind him, tight fitting clothes, and loud noises. *See* Tr. 88, April 21, 2008.

6.      Massie has spent decades seeking treatment and care for his PTSD and physical pains through Veterans Affairs Hospitals. *See* Tr. 84-88, 121, April 21, 2008; Exs. 7-9.

7.      Massie suffers from a short temper that he did not have before his time in captivity and admits to being a vengeful man since his release. *See* Tr. 86-87, 119, April 21, 2008.

8.      During the eleven months of his captivity, Massie lost about 51 pounds of weight due to stress and inadequate nourishment. *Id*. at 99.

9.      After his release, Massie received the Purple Heart and the Prisoner of War Medal. *Id*. at 69-70. The Purple Heart is awarded in the name of the President of the United States to any member of the Armed Forces who, while serving the Armed Forces, has been wounded or killed or who has died or may die after being wounded while being held as a prisoner of war or while being taken captive. *See* Pls.' Trial Ex. 1 ("Ex. 1") at 2.

**Dunnie Richard Tuck**

10.     Dunnie Richard Tuck is a United States citizen and is currently a domiciliary of the State of Mississippi. Immediately before being assigned to the Pueblo, Tuck was domiciled in the Commonwealth of Virginia. *See* Tr. 7, April 22, 2008.

11.     At the time he was taken hostage on January 23, 1968, Tuck was employed by the Naval Oceanographic Office. *See id*. at 8.

12.     During the time he was held hostage, Tuck was beaten, tortured and subjected to constant mental and psychological terror on a daily basis.  *See id*. at 55-56.

13.     Because Tuck was in civilian clothes at the time he was hijacked, he was initially considered to be an FBI "Spy" and was threatened to be shot because he was not protected under the Geneva Convention.  *See id*. at 41-42.  Because civilians do not fall under the Geneva Convention rules, Tuck was aware that he could be shot immediately.  This fear of execution loomed over his head throughout his incarceration and caused him severe emotional distress.  *See id*. at 41-44, 50-51.

14.     Tuck sustained severe and permanent physical injuries as a result of the treatment he received during his captivity, including permanent injuries to his back, ankles, and knees and ringing in his ears.  *See id*. at 58-59.  As a result of being repeatedly kicked and hit in the mouth with rifle butts, his lips periodically split open.  *See id*. at 52.

15.     Tuck suffers from PTSD, disability and disfigurement.  On account of his injuries, he has sustained  lost wages and earning potential and has incurred medical expenses. Years after being released, he still suffers from general anxiety, flashbacks to his time in North Korea while asleep at night, waking up in cold sweats, and a lingering anxiety that a sharp noise or a bump on the bed could signal his end.  *See id*. at 59-60.

16.     Because he was serving his country as a civilian, Tuck was not eligible for assistance from the Veterans Administration and therefore has had to cover his own medical expenses.  *See id*. at 85-86.  Moreover, although he suffers lasting disability as a result of being repeatedly and severely beaten while being held hostage, there is no comparable civilian process available to adjudicate the degree of his disability or to award him disability payments.

17.     During his eleven months in captivity, Tuck lost about 37 pounds of weight due to stress and inadequate nourishment. *Id*. at 80.

18.     After his release, Tuck received the Purple Heart and the Prisoner of War Medal. Tuck is one of very few civilians who have received the Purple Heart. *Id*. at 74-75.

**Donald Raymond McClarren**

19.     McClarren is a United States citizen and a domiciliary of the Commonwealth of Pennsylvania. *See* Tr. 11, April 21, 2008. At the time he was taken hostage, McClarren was a Petty Officer 2nd Class, or CT02, Communications Tech, Operator (teletype and crypto). *Id*. at 11-12.

20.     During the eleven months of his captivity, McClarren was beaten, tortured, and subjected to constant mental and psychological terror on a daily basis.

21.     McClarren sustained severe and permanent physical injuries, including arthritis in his back and shoulders, deteriorating disks, and severe pain in his feet and ankles. Because of the pain in his feet and ankles he has difficulty wearing shoes. *See id*. at 61-63.

22.     McClarren suffers from PTSD, disability and disfigurement. He still gets frightened at random and harmless occurrences, such as a door suddenly slamming, and cannot sleep in a totally dark room. *See* Tr. 27, April 21, 2008. McClarren is short-tempered and easily agitated. *Id*. at 24-26. He struggled through alcoholism for twenty years after returning from North Korea. *Id*. at 25. The change in his personality caused by the traumatic events associated with his captivity contributed significantly to two failed marriages. *See id*. at 60.

23.     McClarren eventually received Veterans Affairs benefits to help him get

counseling for his alcoholism and to treat his many physical and mental ailments. *Id.* at 24-26, 58, 60-63.

24.     After his release from captivity, McClarren received the Purple Heart and the Prisoner of War Medal. *Id.* at 52-54.

### Commander Lloyd Bucher

25.     Prior to his death on January 28, 2004, Cdr. Bucher was a United States citizen and a domiciliary of the State of California.

26.     During his captivity, Cdr. Bucher was severely beaten and tortured and subjected to constant mental and psychological terror.

27.     Cdr. Bucher sustained severe and permanent physical injuries which ultimately shortened his life. *See* Tr. 108, April 22, 2008.

28.     Cdr. Bucher suffered from PTSD, disability, and disfigurement and was classified as one hundred percent disabled by the Veterans Administration. *See* Tr. 104, April 22, 2008. After his release, Cdr. Bucher exhibited a changed personality and was extremely short-tempered with his wife and children. He was tense and nervous and would visibly shake after being startled from something as simple as a breeze slamming a door shut. At night, a bump of his bed or noises would disturb him and cause night sweats; he often could not go back to sleep. *See id.* at 99-100, 103.

29.     The unlawful hijacking of the USS Pueblo also had an adverse impact on Cdr. Bucher's naval career by foreclosing his otherwise likely promotion to at least the rank of Captain in the U.S. Navy. His career was effectively ended by North Korea's illegal seizure of the USS Pueblo, and he was forced to retire from the Navy earlier than he had planned. *See id.* at 107-08.

30.     During his eleven months of captivity, Cdr. Bucher lost about 50 pounds of weight due to stress and inadequate nourishment. *Id*. at 118. In addition, he suffered extreme mental anguish caused by the forcible surrender of his ship and crew and the ensuing severe, inhumane beatings suffered by his crew, which he was helpless to stop. *See* Tr. 104-05, April 21, 2008; Tr. 127, April 22, 2008.

31.     Cdr. Bucher received the Purple Heart (with one gold star) and the Prisoner of War Medal. Tr. 92-93, April 22, 2008.

**Rose Bucher**

32.     Rose Bucher is the widow of Cdr. Bucher and is the duly appointed Personal Representative of his Estate.

33.     Rose Bucher has at all relevant times been a United States citizen and a domiciliary of the State of California.

34.     The kidnaping, torture, beating and prolonged detention and holding hostage of Cdr. Bucher caused Rose Bucher to lose and be deprived of the services, support, affection, consortium, and companionship of her husband. During her husband's captivity, Rose Bucher missed her husband's presence, physical touch, and loving words. In addition, while suffering the mental torment of not knowing whether she would ever see her husband again, she bore the burden of caring for her family as well as the family members of the hostages. *See* Tr. 109, April 22, 2008.

35.     While Rose Bucher received a few letters from Cdr. Bucher while he was in North Korea, she could tell that they were not his words, and just his handwriting. The letters were dictated by someone else. The letters only provided some relief to her constant stress and anxiety, as they indirectly informed her that her husband was alive. *See id*.

36.    After his release, Cdr. Bucher remained distant with regards to talking to his wife about his feelings and thoughts of his time in North Korea.  *See id.* at 138, 141-42.  Nevertheless, he described the beatings and the torture, both physical and mental, to which he had been subjected.  *See id.* at 110, 125-26.

## II.  CONCLUSIONS OF LAW

1.    As this action is brought against a foreign state, the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.*, as amended, controls.  *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488-89 (1983); 28 U.S.C. § 1330.

2.    In the Anti-Terrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 221(c), 110 Stat. 1214, 1243, Congress lifted the immunity of foreign states officially designated by the Department of State as a state sponsor of terrorism, if the foreign state commits a terrorist act or provides material support and resources to an individual or entity that commits such an act resulting in the death or personal injury of a United States citizen.  *See* 28 U.S.C. § 1605(a)(7)[1].  Under this Act, a foreign sovereign is not immune to suit in U.S. courts when:

> money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state

_____

[1]  Plaintiffs brought suit under 28 U.S.C. § 1605(a)(7).  Pursuant to the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-44 (2008), 28 U.S.C. § 1605(a)(7) was replaced by 28 U.S.C. § 1605A.  Section 1605(a)(7) still applies to actions brought prior to the effective date of 28 U.S.C. § 1605A, however.  *Simon v. Republic of Iraq,* 529 F.3d 1187, 1191-92 (D.C. Cir. 2008) ("the new terrorism exception in § 1605A by its terms does not provide a substitute basis for jurisdiction over all cases pending under § 1605(a)(7) . . . to claim the benefits of § 1605A, the plaintiff must file a new action under that new provision.").  Accordingly, this court analyzes plaintiffs' action under 28 U.S.C. § 1605(a)(7).

> while acting within the scope of his or her office, employment, or
> agency.

*See also* H.R. Rep. No. 383, 104th Cong., 1st Session 1995 at 137-38, *available at* 1995 WL 731698.

3.      Although plaintiffs Massie, Tuck, McClarren and Cdr. Bucher were released from captivity more than twenty-five years prior to the enactment of the Anti-Terrorism and Effective Death Penalty Act of 1996, Congress has expressly directed the retroactive application of 28 U.S.C. § 1605(a)(7) to further a comprehensive counter terrorism initiative by the legislative branch of government.  *See* 28 U.S.C. § 1605 note (West Supp. 1997) ("amendments made by this subtitle shall apply to any cause of action arising before, on or after the date of the enactment of this act [April 24, 1996])."  Similarly, the ten-year statute of limitations for actions under § 1605(a)(7) does not bar the claims in this case because Congress has provided that victims of terrorism be given the benefit of "all principles of equitable tolling, including the period during which the foreign state was immune from suit …"  28 U.S.C. § 1605(f); *see also Simon v. Republic of Iraq,* 529 F.3d 1187, 1195-96 (D.C. Cir. 2008).  Because North Korea was immune from suit by these plaintiffs under the FSIA until the enactment of § 1605(a)(7) in 1996, the Complaint herein was duly and timely filed on April 24, 2006.  *Simon*, 529 F.3d at 1195-96.

4.      A copy of the Complaint, which was translated into Korean, was properly served with process pursuant to 28 U.S.C. § 1608(b)(3)(B), on September 8, 2006.  Defendants have failed to respond or appear in this case.

5.      To establish subject matter jurisdiction and, thus, subject a foreign sovereign to suit under section 1605(a)(7), a claim must set forth the following statutory elements:

> that personal injury or death resulted from an act of torture,
> extrajudicial killing, aircraft sabotage or hostage taking; and

the act was either perpetrated by the foreign state directly or by a non-state actor which receives material support or resources from the foreign state defendants; and

the act or the provision of material support or resources is engaged in by an agent, official or employee of the foreign state while acting within the scope of his or her office, agency or employment; and

that the foreign state be designated as a state sponsor of terrorism either at the time the incident complained of occurred or was later so designated as a result of such act; and

if the incident complained of occurred within the foreign state defendant's territory, plaintiff has offered the defendants a reasonable opportunity to arbitrate the matter; and

either the plaintiff or the victim was a United States national at the time of the incident; and

similar conduct by United States agents, officials, or employees within the United States would be actionable.

28 U.S.C. § 1605(a)(7).

6.      Plaintiffs have proven each one of the foregoing elements.

7.      Sections 1605(e)(1) and (2) of the FSIA provide guidance with regard to interpreting the terms "torture" and "hostage taking."  Article One of the International Convention Against the Taking of Hostages defines the term "hostage taking" as:

[a]ny person who seizes or detains and threatens to kill, to injure or to continue to detain another person [hereinafter referred to as the "hostage"] *in order to compel a third party*, namely, a State, an international governmental organization, a natural or judicial person, or a group of persons, *to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage* commits the offense of taking of hostages within the meaning of this Convention.

*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 94 (D.C. Cir. 2002).

8.      "Torture" is defined in § 3 of the Torture Victim Protection Act of 1991, as follows:

(1) the term 'torture' means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

> (2) mental pain or suffering refers to prolonged mental harm caused by or resulting from-

>> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;

>> (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

>> (C) the threat of imminent death; or

>> (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

28 U.S.C. § 1350 note.

9.      North Korea has been designated a state sponsor of terrorism, in part due to its unlawful seizure of the Pueblo. *See* Public Notice 1048, U.S. Department of State, dated February 5, 1998, 53 FR 347701, 1988 WL 276528 (F.R.) ("In accordance with Section 6(j) of the Export Administration Act (50 U.S.C. App. 2405(j)), I hereby determine that North Korea is a country which has repeatedly provided support of acts of international terrorism." George P. Shultz, Secretary of State). *See also* 134 Cong. Rec. H475-02, H. Con. Res. 246, *Condemning the Bombing by North Korean Agents of Korean Air Lines Flight 858* (Feb. 24, 1988) (expressing "the bipartisan support in the Congress for the sanctions imposed by the executive

branch, specifically, adding North Korea to the list of states supporting international terrorism which is maintained pursuant to section 6(j) of the Export Administration Act of 1979").

10.    Massie, Tuck, McClarren and Cdr. Bucher were victims of "torture" as defined in section 3 of the Torture Victims Protection Act of 1991 (28 U.S.C. § 1350 note), pursuant to 28 U.S.C. §§ 1605(a)(7) and 1605(e)(1).

11.    Massie, Tuck, McClarren and Cdr. Bucher were victims of "hostage taking" as defined in Article 1 of the International Convention Against the Taking of Hostages, pursuant to 28 U.S.C. §§ 1605(a)(7) and 1605(e)(1).

12.    Massie, Tuck, McClarren, Cdr. Bucher and Mrs. Bucher have suffered "personal injury" within the definition of 28 U.S.C. §§ 1605(a)(7) as a result of the actions of North Korea in holding hostage and subjecting those aboard the Pueblo to physical and mental torture.

13.    Even though North Korea has failed to respond to the Complaint served on September 8, 2006 under section 1608 of the FSIA, North Korea, by letter dated March 27, 2008, has been provided an opportunity to arbitrate the claims at issue here.

14.    Plaintiffs are American citizens.

15.    Once a foreign state's immunity has been lifted under § 1605 and jurisdiction is proper, § 1606 provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 1606.

16.    The state laws of California, Illinois, Virginia and Pennsylvania provide a basis for liability in this case.

**(Torture)**

17.    Plaintiffs  allege common law assault, battery, false imprisonment, intentional infliction of emotional distress and loss of solatium.  They also seek money damages for

economic damages, loss of solatium, pain and suffering for the acts that are among those described in 28 U.S.C. § 1605(a)(7). The acts complained of include personal injury that was caused by acts of torture and hostage taking.

18.      Torture is a severe form of battery which, under California law, "is any intentional, unlawful and harmful contact by one person with the person of another." *Ashcraft v. King,* 228 Cal. App. 3d 604, 611 (Cal. Ct. App. 1991). The tort of civil battery consists of the following three elements:

      (1) the defendant intentionally did an act that resulted in a harmful or offensive contact with the plaintiff;

      (2) the plaintiff did not consent to the contact;

      (3) the contact caused injury, damage, loss or harm to the plaintiff. *Id.* All of these elements have been demonstrated and proven in this case.

19.      "[U]nder California law, when a person is injured by the tortuous acts of another, she is entitled to recover from the tortfeasor an amount that will compensate for all the detriment proximately caused by the tortious acts." *Priest v. Rotary*, 634 F. Supp. 571, 584 (N.D. Cal. 1986).

20.      It is also well established in California that the damages recoverable by the victim of a tortuous act also may include recovery for "the grief, anxiety, worry, mortification, and humiliation which one suffers by reason of physical injuries." *Merrill v. Los Angeles Gas & Elec. Co.*, 158 Cal. 499, 512 (Cal. 1910).

21.      An essentially identical cause of action for battery is available under the laws of the Commonwealths of Pennsylvania and Virginia and the State of Illinois. *See, e.g.*, *Levenson v. Souser*, 557 A.2d 1081, 1088 (Pa. Super. 1989); *Koffman v. Garnett*, 574 S.E.2d 258, 261 (Va. 2003); *Welton v. Ambrose*, 814 N.E.2d 970, 979 (Ill. App. Ct. 2004).

**(Assault and Battery)**

22.     North Korea is responsible for numerous acts of assault and battery upon Massie, Tuck, McClarren, and Cdr. Bucher during their arrest and imprisonment.

23.     Plaintiffs are entitled to recover for the severe, multiple and incessant assaults and batteries that were committed by agents of North Korea on Massie, Tuck, McClarren, and Cdr. Bucher between January 23, 1968 and December 23, 1968.

**(False Imprisonment)**

24.     At the time that the Pueblo came under an unprovoked and unlawful attack by North Korea, it was  operating in international waters beyond the boundaries of North Korea. After being forcibly removed from their ship Massie, Tuck, McClarren, and Cdr. Bucher were unlawfully detained and held hostage against their will and without their consent for a period of eleven months.

25.     California, Pennsylvania, Illinois and Virginia provide a cause of action for false imprisonment as alleged in the complaint.

26.     Massie, Tuck, McClarren, and Cdr. Bucher plaintiffs were falsely imprisoned by North Korea.

**(Intentional Infliction of Emotional Distress)**

27.     California law provides a cause of action for intentional infliction of emotional distress where a plaintiff can satisfy the following elements: "(1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering and (4) actual and proximate causation of the emotional distress." *Agarwal v. Johnson,* 25 Cal. 3d 932, 946 (Cal. 1979), *overruled on other grounds by White v. Ultrimar,* 21 Cal. 4th 563, 574 n.4 (Cal. 1999).  Similar relief is recognized by Illinois and Virginia.  *Reilly v. Wyeth*, 876 N.E.2d 740, 755 (Ill. App. Ct. 2007).

28.     Although Pennsylvania has not expressly recognized a cause of action for intentional infliction of emotional distress, its courts have cited the Restatement (Second) of Torts § 46(2) for the minimum elements necessary to sustain such a cause of action. *Taylor v. Albert Einstein Medical Center*, 754 A.2d 650, 652 (Pa. 2000) (citing *Kazatsky v. King David Mem'l Park*, 527 A.2d 988 (Pa. 1987)).

29.     Damages for intentional infliction of emotional distress may be recovered for both economic losses, which include "[r]easonable compensation for any financial loss suffered by the plaintiff which was proximately caused by emotional distress," and non-economic losses such as damages for "humiliation, anxiety, and mental anguish." *Agarwal*, 25 Cal. 3d at 953.

30.     Rose Bucher was the spouse of Cdr. Bucher.  Cdr. Bucher died on January 28, 2004.  During his lifetime, Cdr. Bucher had causes of actions for the physical injuries and damages he suffered at the hands of agents of North Korea.  Such causes of action survive pursuant to state law and are brought by, Rose Bucher, the Personal Representative of the Estate of Lloyd Bucher.

**(Loss of Solatium)**

31.      The tortious conduct of North Korea proximately caused Rose Bucher to lose and be deprived of the services, support, consortium, affection, companionship, and solatium of and with her husband, Lloyd Bucher.

32.     This court has recognized the cause of action for loss of solatium under the federal common law by relying upon the Restatement (Second) of Torts § 46.  *Stethem v. Islamic Republic of Iran*,  201 F. Supp. 2d 78, 89 (D.D.C. 2002) (internal citation and quotation omitted) ("[O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress.  All acts of

terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience." )

**Damages**

33. The effects of the outrageous conduct of North Korea will be felt by Massie, Tuck, McClarren, and Rose Bucher for the rest of their lives. Because § 1606 of the FSIA provides that a "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 1606, plaintiffs are entitled to the typical array of compensatory damages that may be awarded against tortfeasors in California, Virginia, Illinois and Pennsylvania.

**(Pain and Suffering of Massie, Tuck, McClarren, and Cdr. Bucher During Captivity)**

36. The pain and suffering endured by Massie, Tuck, McClarren, and Cdr. Bucher, over the eleven months of their captivity was extensive and shocking. While there is no set formula for quantifying the damages for such pain and suffering, in some cases of prolonged and abusive captivity, plaintiffs are awarded approximately $10,000 per day for the pain and suffering they experienced while captive. *See, e.g., Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 134 (D.D.C. 2005) ("Price II").

37. Massie, Tuck, McClarren, and Cdr. Bucher case are entitled to damages of $10,000 per day, for a total of $3,350,000 each for the pain and suffering they endured throughout their 335 days of captivity. Rose Bucher is entitled to $1, 250, 000 for the pain and suffering she suffered during this period.

**(Pain and Suffering After Captivity)**

38. As was recognized in *Price II* "[i]n some cases the per diem amount will adequately compensate plaintiffs for pain and suffering both during and after captivity." *Price II*,

384 F. Supp. 2d at 135. As in *Price,* "this is not one of those cases." *Id.* In this case, Massie, Tuck, McClarren, suffered physical and mental harm that has endured for the past 39 years and likely will continue to endure throughout the rest of their lives. Cdr Bucher suffered such effects until he died.

39.     Massie, Tuck, McClarren, each, is entitled to $13, 400,000 for their post release and future pain and suffering. The estate of Cdr Bucher is entitled to recover $11,000,000 for his post release pain and suffering.

A judgment accompanies this memorandum.

Henry H. Kennedy, Jr.
United States District Judge
